UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,               )
                                        )
            Plaintiff,                  )
                                        )
v.                                      )        No.:   3:07-CR-3
                                        )               (VARLAN/GUYTON)
ERIC DEWAYNE BOYD,                      )
                                        )
            Defendant.                  )

## MEMORANDUM AND ORDER

This criminal case was before the Court on October 15, 2008 for the imposition of judgment and sentencing of defendant, Eric Dewayne Boyd. [See Doc. 173.] The Court considered defendant's objections to the presentence report, defendant's motion for a downward departure and supporting memorandum [Docs. 166; 167], the government's response in opposition to defendant's motion for downward departure [Doc. 168], defendant's reply to the government's response in opposition to defendant's motion for downward departure [Doc. 169], and the government's sentencing memorandum [Doc. 170], as well as the parties' arguments and presentation of evidence at the sentencing hearing.

At the sentencing hearing, the Court decided defendant's motions, determined the advisory guideline range applicable to defendant's sentencing, and consistent with these determinations and after carefully considering the factors listed in 18 U.S.C. § 3553(a), imposed a sentence of 216 months. The substance of this written memorandum opinion was presented orally from the bench at the sentencing hearing.

## I.    Methodology Used in Sentencing

Prior to the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), it was mandatory for district judges to sentence defendants within the guideline range as calculated according to the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"). However, in *Booker*, the Supreme Court found that mandatory application of the Guidelines violates the Sixth Amendment because defendants have a right to have the facts which increase their authorized punishment determined by a jury beyond a reasonable doubt and mandatory application of the guidelines required judges to engage in this fact finding. *Id.* at 231-34, 244. Accordingly, to correct this rights violation, *Booker* rendered the Guidelines advisory. *Id.* at 245. Post-*Booker*, the Court is required to consider the applicable guideline range, but may "tailor the sentence in light of other statutory concerns as well." *Id.* (citing 18 U.S.C. § 3553(a)); *accord United States v. Stone*, 432 F.3d 651, 655 (6th Cir. 2005).

Since *Booker* rendered the Guidelines advisory, the Supreme Court has further detailed the procedure district courts should apply in sentencing:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. *See* [*Rita v. United States*, 127 S.Ct. 2456 (2007)]. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. *See id.*, at ----, 127 S.Ct. 2456. He must make an individualized assessment based on the facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the

justification is sufficiently compelling to support the degree of the variance. We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one. After settling on the appropriate sentence, he must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing. *Id.*, at ----, 127 S.Ct. 2456.

*Gall v. United States*, 128 S.Ct. 586, 596-97 (2007); *see also United States v. Buchanan*, 449 F.3d 731, 738-39 (6th Cir. 2006) (Sutton, J., concurring). While a sentencing judge need not give a lengthy explanation of his reasons for a sentence within the guideline range, the judge will normally address any nonfrivolous arguments for a different sentence presented by either the defendant or the government. *United States v. Liou*, 491 F.3d 334, 338 (6th Cir. 2007). *But see United States v. Vonner*, 516 F.3d 382, 387 (6th Cir. 2008) (noting that, at least to survive plain error review, the sentencing court need not address every argument raised by the parties). However, there need not be extraordinary circumstances to justify a sentence outside of the guidelines range, nor is there a requirement that the district court use a mathematical formula to calculate a percentage departure. *Gall*, 128 S. Ct. at 595.

Finally, the Sixth Amendment does not prohibit a sentencing court from the necessary exercise of finding facts for the purpose of determining a defendant's advisory guideline range post-*Booker*. In *Vonner*, the defendant argued that his sentence violated the Sixth Amendment because it was based on facts other than convictions that were neither admitted by the defendant nor found beyond a reasonable doubt by a jury. *Id.* at 384-85. The Sixth Circuit *en banc* confirmed that the district court may make factual findings at sentencing that affect a defendant's guideline range as long as the court treats the guidelines as advisory. *Id.*

at 385. The *Vonner* court also noted that a defendant accepts as true any factual allegations to which he does not object. *Id.*

## II. Factual Background

On April 7, 2008, this case proceeded to trial on the two counts charged in the Second Superseding Indictment [Doc. 106]. Count One charged defendant with being an accessory after the fact of a carjacking that resulted in serious bodily harm and death, in violation of 18 U.S.C. § 3, with a maximum penalty of 15 years' imprisonment. Count Two charged defendant with misprision of a felony, in violation of 18 U.S.C. § 4, with a maximum penalty of 3 years' imprisonment. On April 16, 2008, a jury convicted defendant of the crimes charged in both Counts One and Two.

As set out in Paragraphs 15-34 of the Presentence Investigation Report ("PSR") prepared by the United States Probation Office, defendant's specific offense conduct related to these convictions, as gleaned from the trial testimony and records in this case, is as follows:

15. The following information was obtained from reviewing the United States Attorney's Office case file material, trial testimony, and interviews with law enforcement agents.

**The Investigation:**

16. The investigation would show that Christopher Newsom, along with his girlfriend, Channon Christian, were leaving a friend's apartment, located at the Washington Ridge Apartment complex in Knoxville, Tennessee, in the late evening hours of January 6, 2007. Christopher Newsom was standing at the driver's side door, and Channon Christian was in the driver's seat when they were approached by several individuals armed with firearms. As another vehicle approached, the couple was pushed into the vehicle and abducted. Mr.

4

Newsom and Ms. Christian were blindfolded and taken to a residence located at 2316 Chipman Street, Knoxville, Tennessee. Although all details are not known at this time, sometime shortly after the abduction, Christopher Newsom was taken from this house, tied up, shot three times, and his body was thrown by nearby railroad tracks. The body was then doused with gasoline and set afire.

17.    Friends of the couple became concerned when they did not show up at another friend's house the evening of January 6, 2007, and Channon Christian did not show for work on January 7, 2007.

18.    On January 7, 2007, at approximately 7:45 a.m., Roy Thurman, an employee of a nearby railroad, saw smoke by the railroad track. At approximately 12:24 p.m., a Norfolk Southern Railroad train engineer reported to the Knoxville City Police Department that he had seen a body beside the railroad track. At approximately 12:55 p.m., Christopher Newsom's body was found by railroad tracks located near the Chipman Street address. The body had been tied with a belt around his ankles, and a shoelace secured his left wrist, which was then positioned behind his back. Mr. Newsom's head and face had been wrapped with what appeared to be a sweatshirt. Another shoe lace had been tied around his head and mouth to hold a sock gag in his mouth. There was a bullet wound visible on the right side of his head.

19.    On January 8, 2007, at approximately 1:38 a.m., Channon Christian's 4-Runner was located near the Chipman Street address by friends who had been searching for the couple. Investigators with the Knoxville Police Department were able to process a latent fingerprint found on an envelope inside of the 4-Runner. The fingerprint was later identified as belonging to Lemaricus Davidson, and further investigation revealed Davidson had a residence at 2316 Chipman Street, Knoxville, Tennessee.

20.    Subsequently, on January 9, 2007, at approximately 1:39 p.m., entry was made to the Chipman Street house via a search warrant, and five minutes later, Channon Christian's body was found in a trash can with trash bags, and material with a floral print. Daphne Sutton, who had resided with Davidson at this address, would later testify that the floral print material was from a comforter that had been on Davidson's air mattress in the Chipman Street house.

21.   After numerous law enforcement agents investigated this case for possible suspects, warrants were issued for Lemaricus Davidson (a/k/a "Slim"), Letalvis Cobbins, George Thomas, and defendant Boyd.

**The Forensic Evaluation:**

22.   The medical examiner confirmed that Christopher Newsom's face and head had been wrapped in a sweatshirt, and a grey and white sock was in his mouth with a shoelace wrapped around the sock and the back of the neck. The autopsy later revealed that Christopher Newsom had been shot three times, once on the right side of the head, once on the right side of the neck, and once in the back. Further, Mr. Newsom had been sodomized and was not wearing pants.

23.   During the autopsy of Channon Christian, the medical examiner found that Ms. Christian had been repeatedly and violently raped, both vaginally and orally, and had been violently sodomized. The perpetrators had used bleach in her mouth and vaginal area in an attempt to destroy evidence. Nevertheless, DNA analysis revealed the presence of spermazoa and sperm fragments in Ms. Christian's mouth, vagina, and on various items of her clothing. Lemaricus Davidson and Letalvis Cobbins were later determined to be the contributors of that DNA. The medical examiner further determined that Channon Christian was alive when placed in the trash can, but was tied in such a way that she could not breath and could not get out of the trash can. The cause of death was positional asphyxiation.

**Trial Testimony Establishing Defendant Boyd's Accountability in the Criminal Offense:**

24.   Xavier Jenkins, an employee of Waste Connection, a business located next to the 2316 Chipman Street address, testified at trial that at approximately 1:30 a.m. on January 7, 2007, he saw a 4-Runner with its parking lights on stopped in front of the Chipman Street house when he reported to work. Parked behind the 4-Runner was a white car, and lights were on inside the home at this address. Mr. Jenkins testified that there appeared to be a lot of activity at the house. Mr. Jenkins further testified he later saw four black males drive by in the 4-Runner as he was sitting in his parked vehicle at his work site. Later that morning at approximately 6:45 a.m., Mr. Jenkins saw the same 4-Runner parked near the Chipman Street house.

6

25.     From a vehicle lineup, Mr. Jenkins identified the other vehicle he had seen parked behind the 4-Runner at 1:30 a.m. that morning. Law enforcement officials had established that the vehicle belonged to an individual named Nicole Mathis, a cousin of Eric Boyd. During both direct and cross examinations, Mr. Jenkins was positive the other vehicle was the one later identified as belonging to defendant Boyd's cousin, Nicole Mathis.

26.     Nicole Mathis testified that on either January 4, 2007, or January 5, 2007, she loaned defendant Boyd her white Pontiac Sunbird, and that she did not get her car back that weekend. Ms. Mathis testified that she did not know Lemaricus Davidson, and had never been at this Chipman Street address. On Monday, January 8, 2007, Ms. Mathis went to her aunt's apartment in Ridgebrook (defendant Boyd's mother's residence) to retrieve her vehicle because she needed to go to a job interview. She retrieved the keys from the apartment. Boyd, who was at the apartment, told her that the car was broken down. When she tried to start the vehicle, water or fluid began pouring out of the engine area. Ms. Mathis decided to get some property out of the vehicle, at which time she discovered a plastic bag containing small bullets underneath the front passenger seat. Ms. Mathis said she knew nothing about the bullets and she discarded them because she did not want the bullets in her car. While she was retrieving her property, defendant Boyd came out of his mother's apartment and walked down the sidewalk. Defendant Boyd was talking on a cellular telephone, and Ms. Mathis heard the defendant say "I might be in some trouble." It should be noted that this occurred prior to the defendant providing food and shelter to Davidson.

27.     Trial testimony further established that on January 7, 2007, at approximately 11:00 p.m., Lemaricus Davidson went to his girlfriend, Daphne Sutton's apartment[1] in a 4-Runner, but left shortly after speaking with Ms. Sutton. Ms. Sutton later picked up Davidson, and Davidson stayed with her at the apartment that night, and was with Ms. Sutton during the day and the night of January 8, 2007. On January 9, 2007, at approximately 4:15 p.m., Daphne Sutton received a telephone call from her mother regarding the news coverage about Channon Christian's body being found at Davidson's residence on Chipman Street. At approximately 5:00 p.m., and as a result of that telephone call, Ms. Sutton told Davidson he would have to leave the apartment. After dark, she and two of her friends, Brandy Pressley and Kassie Suttles, drove

---

[1]The trial testimony established that though Daphne Sutton was staying at this apartment, it was leased by Brandy Pressley and Kassie Suttles.

Davidson to the Ridgebrook Apartment complex area located in Knoxville, Tennessee, and dropped him off.

28. Danielle Lightfoot testified that on the evening of January 9, 2007, defendant Boyd and Davidson came to her apartment. Both of them were dressed in dark clothing, including hooded sweatshirts. Both then requested they be allowed to stay in Ms. Lightfoot's apartment, and she agreed to allow them to spend the night.

29. Kevin Armstrong testified that he went to Ms. Lightfoot's apartment in response to a telephone call from defendant Boyd, at approximately 11:30 p.m. that same evening. Mr. Armstrong was surprised to see Lemaricus Davidson, as he had seen the news about a body being found at Davidson's residence. Mr. Armstrong became concerned and left the apartment, but defendant Boyd and Davidson continued to call him to try and gain his assistance in helping Davidson get out of town. Telephone records confirmed that several telephone calls were made from defendant Boyd's telephone to Mr. Armstrong's telephone. Mr. Armstrong testified that he quit answering his telephone.

30. On January 10, 2007, at around 12:00 p.m., Ms. Lightfoot saw news coverage of Channon Christian's body being found at Davidson's house. Defendant Boyd and Davidson were still present in Lightfoot's apartment at that time. Ms. Lightfoot instructed Davidson to leave, but allowed him to stay until dark. Ms. Lightfoot went on a short trip, but returned at approximately 9:30 p.m. to find Davidson and defendant Boyd still in her apartment. At that time, she ordered them to leave. Boyd and Davidson hid themselves in a nearby wooded area while Boyd called various people to try to arrange transportation away from the area. At some point, defendant Boyd left Davidson in the woods while he walked to the nearby apartment of LaKeisha and Leesa Greer in an effort to get assistance "for a ride somewhere" for "Slim." They did not offer any assistance.

31. By 3:30 a.m. on January 11, 2007, no ride was secured, and Davidson and defendant Boyd broke and entered into a vacant house on Reynolds Street, which is in close proximity to the Ridgebrook Apartment complex. Boyd and Davidson broke into the house to hide from the police. Because Boyd intended to and did commit the felony offense of accessory after the fact inside the house, Boyd's breaking into the house constitutes the separate felony offense of burglary under Tennessee law. Boyd remained in the house with Davidson for approximately two hours. At 5:30 a.m. on January 11, 2007, defendant Boyd left that house, and went to his mother's residence. At

8

approximately 9:00 a.m., defendant Boyd went to the apartment of Kamara Bangura, who lived upstairs from his mother, and used her cellular telephone to make telephone calls to his cell phone, which he had left with Davidson so they would be able to communicate. Boyd and Davidson had devised a calling system whereby Boyd would call his cellular telephone (in Davidson's possession) twice, in quick succession, to alert Davidson that it was Boyd who was calling. Davidson would then call Boyd back. Telephone records confirm that Boyd and Davidson in fact used that system relative to calls made by Boyd from Bangura's apartment as described above. At approximately 10:00 a.m., Leesa Greer saw defendant Boyd in the area of Ridgebrook Apartments. Defendant Boyd told Ms. Greer that he was going to take food to Davidson, and he was holding a McDonald's bag in his hand.

**The Arrest:**

32.     At approximately 1:30 p.m., defendant Boyd was stopped by officers and denied that he knew of Davidson's whereabouts. After the initial denial, he was permitted to give the officers the address of where Davidson was hiding, and Boyd was not further detained at that time. At approximately 4:00 p.m., Davidson was found in the vacant house and taken into custody. Boyd's cellular telephone, a revolver, Christopher Newsom's tennis shoes, and a McDonald's bag were among the items found in the vacant house where Davidson was arrested. The owner of the house testified that none of those items were in the house prior to the break-in. At 4:15 p.m., defendant Boyd went to Ms. Lightfoot's apartment and told her Davidson had been found by law enforcement. Defendant Boyd was once again picked up by law enforcement at approximately 5:00 p.m., after some of the other defendants named him as having been involved in the carjacking and murders.

33.     George Thomas and Letalvis Cobbins had fled to the Commonwealth of Kentucky, and were apprehended on January 11, 2007. Both were returned to Knoxville, Tennessee, to face both federal and state charges. Lemaricus Davidson, Letalvis Davidson (Cobbins), George Thomas, and defendant Eric Boyd were charged in a federal indictment. However, all cases were dismissed in favor of state prosecutions, except for defendant Boyd, who stood trial on the instant federal offenses of Accessory After the Fact, and Misprision of a Felony.

34.     The following factors are considered in determining defendant Boyd's culpability in the offense level in order to determine the base offense level. These factors include the following. The defendant's borrowed vehicle was at

9

the Chipman Street address in the early morning hours when the carjacking and homicides occurred. The perpetrators needed some mechanism to get to the Washington Ridge Apartment complex, although there is no direct evidence that defendant Boyd drove them there. When interviewed by law enforcement, the defendant knew intimate details of the carjacking and homicide of Newsom that had not been released to the media. His claim that Davidson, with whom the defendant only had a short term relationship, would share details of Davidson's own involvement in the strangulation and rape of Channon Christian is somewhat difficult to accept in its entirety. In addition, Xavier Jenkins saw four black males in the 4-Runner, and no other black males have been identified as participating in this offense other than Lemaricus Davidson, Letalvis Cobbins, George Thomas, and Eric Boyd. Bullets were found in the vehicle that defendant Boyd had borrowed from his cousin, Nicole Mathis, and Mathis denied any knowledge of the bullets. Boyd actively assisted in the concealment of both Davidson and the crimes themselves from law enforcement. Even though Boyd had a residence in the immediate area, Boyd chose to actively hide out with Davidson in a friend's apartment, in a wooded area, and finally in a vacant house that the two men broke into for the purpose of hiding from police. Boyd actively pursued transportation from friends and acquaintances in a determined effort to find a way for Davidson, and perhaps himself, to leave the area. Boyd established a means of communication between himself and Davidson while Boyd left the hideout to find food for Davidson. Boyd left his cell phone with Davidson and the two communicated using their established system. Boyd did all of these things after having actual and constructive knowledge of Davidson's involvement in the carjacking and murders. Boyd alone was the only person willing to actively help Davidson avoid apprehension once Davidson's involvement became widely known due to news reports. All other persons refused to help. Boyd contacted multiple individuals, including Kevin Armstrong, Leesa Greer, and Danielle Lightfoot, in order to assist Davidson in his flight. In assisting Davidson, defendant Boyd committed a burglary by breaking and entering into a vacant home. Defendant Boyd's criminal conduct clearly and significantly surpasses conduct that would constitute mere harboring. Harboring implies that defendant Boyd's actions would have been limited to passively giving refuge to Davidson and providing him with lodging and shelter. Instead, Boyd actively and steadfastly attempted to assist Davidson in numerous ways, including the providing of transportation, and the active participation in attempts to assist Davidson in the commission of a burglary, and providing transportation in an effort to assist Davidson in fleeing from this area.

10

## III.    Analysis

At the sentencing hearing, the Court heard oral arguments and considered the parties' filings in regard to defendant's objections to the presentence report, defendant's motion for a downward departure, the appropriate guideline range given the possibility of an upward departure due to under-representation of defendant's criminal history, and other factors relevant to sentencing. The Court will discuss each of these issues and its reasons for the sentence imposed.

### A.    Defendant's Objections to the Presence Report

Defendant filed fourteen objections to the PSR with the probation office. Federal Rule of Criminal Procedure 32(i)(3)(B) provides that at sentencing, the court, "must–for any disputed portion of the presentence report or other controverted matter–rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing."

Pursuant to Rule 32(i)(3)(B), if a party alleges factual inaccuracies in the PSR, the Court must engage in fact-finding to resolve the issues. *United States v. McGee*, 529 F.3d 691, 700 (6th Cir. 2008). When a party contests the facts, "a court may not merely summarily adopt the factual findings in the presentence report or simply declare that the facts are supported by a preponderance of the evidence." *Id.* at 699 (quoting *United States v. Solorio*, 337 F.3d 580, 598 (6th Cir.2003)). Instead, the court must articulate its rationale for its factual findings. *United States v. White*, 492 F.3d 380, 416 (6th Cir. 2007); *see also United States v. Ross*, 502 F.3d 521, 531 (6th Cir. 2007). However, a party admits to all of

11

the factual allegations contained in the PSR to which it does not object. *United States v. Vonner*, 516 F.3d 382, 385 (6th Cir. 2008); *United States v. Adkins*, 429 F.3d 631, 632-33 (6th Cir. 2005). The Court has considered each of defendant's objections and now explains its ruling.

### 1.    Objection One

Defendant objects to the PSR labeling LeMaricus Davidson, Letalvus Cobbins, and George Thomas as co-defendants in this case on the basis that these other defendants were dismissed from the case and the defendant has no co-defendants currently charged in federal court. The probation officer responded that it is standard procedure to list all defendants charged in an indictment and there is no reason to amend the report to reflect that the charges against them have been dismissed. The Court recognizes that the charges against the co-defendants were dismissed, but agrees with the probation officer that it is proper to include them in the PSR. Accordingly, this objection is overruled.

### 2.    Objection Two

Defendant objects to factual statements contained within Paragraph 34 of the PSR which suggest that defendant was involved in the carjacking. Specifically, defendant objects to the statement that, "In addition, Xavier Jenkins saw four black men in the Forerunner, and no other black males have been identified as participating in this offense, other than LeMaricus Davidson, Letalvus Cobbins, George Thomas and Eric Boyd."

The Court finds that these factual statements are appropriate as they are supported by the evidence presented at trial. Xavier Jenkins testified at trial about circumstantial evidence

12

which ties defendant to the scene of the carjacking and the Chipman Street house. Mr. Jenkins stated that he saw four black men in a SUV near the Chipman Street house. *See* Trial Tr. vol. 1, 74-75, Apr. 10, 2008 [Doc. 159]. Further placing defendant at the Chipman Street house, Xavier Jenkins identified a photograph of a car he saw parked behind the 4Runner at the Chipman Street house in the early morning hours of January 7, 2007. *See id.* at 78-82. Nicole Mathis identified the same car as her car. *See id.* at 91-93. Ms. Mathis testified that she lent her car to defendant on either January 4, 2007 or January 5, 2007 and did not see it again until January 8, 2007. *See id.* at 94-95; 99. Finally, there was no evidence presented at trial that tied another man, other than the four listed, to the carjacking and Chipman Street house that night. Accordingly, the inclusion of the contested statement in the PSR is appropriate, and this objection is overruled.

### 3. Objection Three

In Objection Three, defendant objects to the statement that he concealed the crimes committed by Davidson, Cobbins, and Thomas arguing that "Boyd was only convicted of an accessory after the fact and nothing in the record indicates that Boyd did anything to conceal the crime that was committed." Contrary to defendant's contention, the jury convicted defendant of Count Two of the indictment which charges defendant with concealing a carjacking which resulted in death and serious bodily injury to another person. Accordingly, this objection is overruled.

### 4. Objections Four and Eight

Objections Four and Eight related to defendant's argument that portions of Paragraph 34 of the PSR are overly broad and inflammatory. Defendant specifically objects to the generalization that defendant pursued transportation from "friends and acquaintances," and that defendant attempted to assist Davidson in "numerous ways." In response to these objections, the probation officer amended the PSR to add the names of individuals whom defendant asked to provide transportation to assist Davidson in his flight and to list the specific ways in which defendant assisted Davidson. The Court finds that these revisions address defendant's Objections Four and Eight; therefore, these objections are overruled.

### 5. Objection Five

Objection Five relates to factual statements contained within Paragraph 34 of the PSR. Specifically, defendant objects to the statements that, "Boyd alone was the only person willing to actively help Davidson . . . All other persons refused to help." Defendant argues that the testimony of Daphne Sutton suggests that this is not the case.

The language defendant omits by his use of ellipses modifies the complete statement in the PSR. The entire statement in the PSR is, "Boyd alone was the only person willing to actively help Davidson *avoid apprehension once Davidson's involvement became widely known due to news reports.* All other persons refused to help." While defendant may not have been the only one to help Davidson avoid apprehension, he was the only one to do so with knowledge that Davidson had committed a carjacking. Contrary to defendant's argument, Ms. Sutton's testimony established that she refused to allow Davidson to stay with

14

her once she learned of some of the facts related to the underlying crimes. *See* Trial Tr. vol. 2, 162-66, Apr. 11, 2008 [Doc. 160]. Thus, the evidence presented at trial demonstrates that defendant was the only one who gave Davidson ongoing assistance after learning of the underlying crimes. Accordingly, this objection is overruled.

### 6. Objection Six

Objection Six relates to factual statements contained within Paragraph 34 of the PSR. In particular, defendant objects to the statement that, "Boyd contacted multiple individuals in order to assist Davidson in his flight." Defendant does not make the basis for this objection clear, but it is either because it is a misstatement of the testimony and facts in this case or because it is a generalization.

The probation officer amended the PSR in response to this objection to reflect that defendant attempted to secure transportation for Davidson from several individuals, including Kevin Armstrong, Leesa Greer, and Danielle Lightfoot. This statement is supported by the evidence presented at trial and provides details making the statement more than a generalization.

Kevin Armstrong testified that he received multiple phone calls from Davidson and defendant requesting a ride "down west." *See* Trial Tr. vol. 3, 100-05, Apr. 14, 2008 [Doc. 161]. Lakeisha Greer testified that Boyd came to her apartment and requested a ride for Davidson. *See id.* at 128-29. Leesa Greer, Lakeisha's sister and roommate, testified that she overheard this conversation between defendant and Lakeisha Greer. *See id.* at 138.

15

Accordingly, the Court finds by a preponderance of the evidence that defendant attempted to secure transportation from multiple individuals, and this objection is overruled.[2]

### 7.  Objection Seven

Objection Seven states, "This type of language is inflammatory and the Probation Office should state the specific facts and not use general terms under these circumstances." Defendant's objection is so vague that it is unclear to the Court exactly what language to which defendant refers.  Though the facts presented in the PSR may not be favorable to defendant, they are supported by the record as has been discussed and are not unfairly inflammatory.  Additionally, the PSR has been amended to provide more specific details in portions of Paragraph 34 to address the few general statements in the former version of the PSR.  For these reasons, this objection is overruled.

### 8.  Objection Nine

In Objection Nine, defendant objects to any victim impact statement in this case stating that, "Although the deaths of Channon Christian and Christopher Newsom are tragic, Eric Boyd is not charged with those deaths. He is not charged, nor convicted, of the activities that caused the deaths of these two young individuals."  Defendant objects both to the inclusion of victim impact statements in the PSR and to the presentation  at the sentencing

---

[2]The Court notes that the testimony at trial established that defendant asked at least Kevin Armstrong and Lakeisha Greer for a ride for Davidson.  Though this differs slightly from the statement in the PSR that defendant sought transportation from Kevin Armstrong, Leesa Greer, and Danielle Lightfoot, defendant did not object to this statement in the amended PSR and, therefore, he is considered to have admitted it.  *See Adkins*, 429 F.3d at 632-33.

hearing of any letters, comments, and testimony from the family members or other friends of the two carjacking victims.

The Court concurs that the families of the two victims killed as a result of the carjacking are not considered victims in this case as defined by Federal Rule of Criminal Procedure 32. However, pursuant to 18 U.S.C. § 3553(a)(1), the Court must consider the nature and circumstances of the offense. The underlying federal offense of defendant's offense of accessory after the fact is the carjacking that resulted in serious bodily harm and death. Accordingly, in considering the nature and circumstances of defendant's offense, it is appropriate and necessary for the Court to consider the underlying offense and its impact on victims, inclusive of family members. *See United States v. Chapple*, 251 Fed. App'x 553, 559 (10th Cir. 2007) (recognizing that, in considering the nature of defendant's offense, it was appropriate for the district court to consider the impact of defendant's actions on other individuals who were negatively affected). Thus, the Court finds the inclusion of the victim impact statements is appropriate both in the PSR and at the sentencing hearing, and this objection is overruled.

### 9. Objection Ten

Defendant objects to Paragraphs 45 through 47 of the PSR to the extent that they suggest the base offense level should be 30. The sentencing guidelines under accessory after the fact provide that the base offense level is six levels lower that offense level for the underlying offense unless an exception applies. U.S.S.G. § 2X3.1(a)(1). One of the exceptions provides that, "In any case in which the conduct is limited to harboring a fugitive

17

. . . the base offense level under this guideline shall be no more than level 20." U.S.S.G. §

2X3.1(a)(3)(B).  Defendant objects to any base offense level that is greater than 20 arguing

that defendant did nothing more than merely harbor Davidson.  The government responds

that defendant's conduct went beyond mere harboring and thus the appropriate base level is

30 as stated in the PSR.

The central question is at what point does conduct become more than conduct limited

to harboring.  The Sentencing Guidelines Manual does not define harboring.  Defendant

suggests that harboring, as it is used in the relevant portion of the sentencing guidelines

manual, should be defined in accordance with 18 U.S.C. § 1071, the statute which makes it

a crime to harbor a fugitive, and the case law interpreting that statute.  As stated in *United*

*States v. Hill*, 279 F.3d 731, 738 (9th Cir. 2002) (quoting *United States v. Yarbrough*, 852

F.2d 1522, 1543 (9th Cir. 2002)), "Any physical act of providing assistance, including food,

shelter, and other assistance to aid the fugitive in avoiding detection and apprehension will

make out a violation of § 1071."  *See also United States v. Zabriskie*, 415 F.3d 1139 (10th

Cir. 2005); *United States v. Green*, 180 F.3d 216, 220 (5th Cir. 1999). The *Hill* court was

essentially determining all conduct that could amount to a violation of the harboring statute.

It did not determine when conduct amounted to more than mere harboring.  Additionally,

defendant has not provided any legal support for his position that the definition of harboring

as it applies to the harboring statute is the definition that should be used to determine conduct

limited to harboring in the sentencing guidelines.  Accordingly, the Court does not find that

18

the definition of harboring as it applies to the harboring statute also defines the phrase "conduct [ ] limited to harboring a fugitive" as it is used in the sentencing guidelines.

The Sixth Circuit has not defined conduct limited to harboring as it is used in the sentencing guidelines, but a review of cases from other jurisdictions is helpful. In *United States v. Vega-Coreano*, 229 F.3d 288 (1st Cir. 2000), the court found that the record supported the district court's decision not to cap the defendant's base offense level at twenty pursuant to U.S.S.G. § 2X3.1 because the defendant's conduct went beyond mere harboring. The court found that the defendant's conduct went beyond mere harboring because the defendant "had done more than simply giving shelter to fugitives." *Id.* at 290. The court specifically stated the facts that support this conclusion:

> [A witness] testified that on the day of the robbery, [the defendant] had accompanied one of the robbers, Jose Ramos-Cartagena, out of the house, at first for one hour and then for two hours. When Ramos returned from the robbery, [the defendant] helped him secrete the proceeds of the robbery by retrieving a key for him. [The defendant] later advised someone named "Rodi" that the money had been counted successfully. Finally, using a false name, [the defendant] obtained three hotel rooms for the other participants in the robbery to use as a hideout.

*Id.*

In *United States v. Jackson*, 1996 WL 762917 (5th Cir. 1996), which the government cites, the Fifth Circuit similarly found that the district court did not commit error by concluding that the defendant's conduct was not limited to harboring when the defendant "did more than merely house the fugitive, he also lied to Agent Powell about the fugitive's whereabouts and the last time he saw the fugitive, and he received a box of stolen money from the robbery." *Id.* at *1.

19

In considering whether defendant's conduct herein went beyond mere harboring, the Court must engage in fact-finding. Contrary to the defendant's contention at the sentencing hearing, the government must prove facts by a preponderance of the evidence, not beyond a reasonable doubt, in order for the Court to consider them at sentencing. *See United States v. Green*, 242 Fed. App'x 343, 345-46 (6th Cir. 2007) (citing *United States v. Gates*, 461 F.3d 703, 707-08 (6th Cir. 2006); *United States v. Coffee*, 434 F.3d 887, 898 (6th Cir. 2006)). Accordingly, the Court's discussion of the facts that follows includes those facts that the Court determines the government has proved by a preponderance of the evidence.

Defendant's conduct went beyond simply providing food and shelter to Davidson. Defendant assisted Davidson in hiding in various locations, including at Danielle Lightfoot's apartment from January 9-10, 2007, in a wooded area near Ridgebrook Apartments from late January 10th until the early morning hours on January 11th, and in a vacant house on Reynolds Street on January 11th. *See* Def. Sentencing Hr'g Ex. 1; Gov't Trial Ex. 33; *see also* Trial Tr. vol. 2, 207, Apr. 11, 2008 [Doc. 160].

Additionally, defendant attempted to help Davidson find a ride to get out of the area. Defendant and Davidson attempted to get Kevin Armstrong's assistance to transport Davidson out of town but were unsuccessful. *See* Trial Tr. vol. 3, 100-05, Apr. 14, 2008 [Doc. 161]. Defendant later left Davidson while they were hiding in the wooded area and went to LaKeisha and Leesa Greer's apartment and asked them "for a ride somewhere" for Davidson. *See id.* at 128-29.

20

It was after these failed attempts at securing a ride that defendant and Davidson broke into the vacant house on Reynolds Street near Ridgebrook Apartments in the early morning hours of January 11, 2007. *See* Def. Sentencing Hr'g Ex. 1; Gov't Trial Ex. 33. Defendant stayed with Davidson at the house for approximately two hours. *See* Def. Sentencing Hr'g Ex. 1; Gov't Trial Ex. 33. When he left, defendant left his cell phone with Davidson so that they could communicate. *See* Def. Sentencing Hr'g Ex. 1; Gov't Trial Ex. 33. They employed a code in which defendant would call his phone (in Davidson's possession) twice in quick succession so that Davidson would know it was him. *See* Def. Sentencing Hr'g Ex. 1; Gov't Trial Ex. 33. Cell phone records and trial testimony show that defendant actually used this code to communicate with Davidson on January 11, 2007. *See* Trial Tr. vol. 3, 157-60, Apr. 14, 2008 [Doc. 161]; Gov't Trial Ex. 46A.

The evidence further shows that during defendant's absence from the Reynolds Street house, he went to get food for Davidson. Leesa Greer testified that around 10:00 a.m. on January 11, 2007, she saw defendant holding a McDonald's bag and defendant told her that he was going to take food to Davidson. *See* Trial Tr. vol. 3, 140-48, Apr. 14, 2008 [Doc. 161]. A McDonald's bag was among the items found in the Reynolds Street house after Davidson was arrested. *See* Trial Tr. vol. 2, 213, Apr. 11, 2008 [Doc. 160]; Gov't Trial Ex. 23D.

Initially when defendant was stopped by officers, he lied and told the officers that he did not know where Davidson was. *See* Trial Tr. vol. 2, 206, Apr. 11, 2008 [Doc. 160]

21

Defendant did not reveal the whereabouts of Davidson until after further questioning. *See id.* at 206-07.

Defendant argues that there is no evidence in the record of defendant's conduct that amounts to more than mere harboring Davidson after defendant learned of the underlying carjacking. Thus, the Court will address the timing of defendant's knowledge.

There is circumstantial evidence which demonstrates defendant had knowledge of the underlying crimes as early as the morning hours of Sunday, January 7, 2007. Specifically, Xavier Jenkins testified that a car identical to defendant's cousin's car, which defendant's cousin stated she had loaned to defendant, was parked behind the 4Runner involved in the carjacking at the Chipman Street house at approximately 1:30 a.m. *See* Trial Tr. vol. 1, 78-82, Apr. 10, 2008 [Doc. 159]; *see also id.* at 91-95. Additionally, even if defendant was not present at the Chipman Street house on January 7, 2008, there is other circumstantial evidence to show that defendant had knowledge of the carjacking well before defendant and Davidson broke into the house on Reynolds Street. On January 9, 2007, defendant and Davidson showed up at Danielle Lightfoot's apartment and they spent the night. *See* Trial Tr. vol. 3, 49-60, Apr. 14, 2008 [Doc. 161]. Around noon on January 10, 2007, they were all watching the news, along with a few others, and an image of Davidson was shown related to involvement in the underlying crimes. *See id.* at 60-63. Ms. Lightfoot testified that everyone was shocked by this news but defendant just put his head down and did not say anything. *See id.* at 65. Additionally, defendant later admitted to having knowledge of the underlying crimes before he heard about them on the news. During his police interrogation,

the tape of which defendant offered as Defendant's Exhibit 1 to the sentencing hearing,[3] defendant stated that he knew about what happened Christopher Newsom [prior to hearing news reports], but did not find out about what happened to Channon Christian until he saw it on the news. *See* Def. Sentencing Hr'g Ex. 1; Gov't Trial Ex. 33.

Based on all of the facts discussed, the Court finds that defendant's conduct after he had knowledge of Davidson's involvement in the underlying crimes was not limited to harboring. To summarize, defendant did not merely acquiesce to hosting an overnight guest but instead actively helped Davidson find new shelter on more than one occasion. This assistance included breaking and entering which amounts to burglary because he intended to commit a felony offense of accessory after the fact inside the house. Committing a separate felony in addition to the offense of accessory after the fact to further assist Davidson in avoiding apprehension certainly goes beyond mere harboring. Additionally, defendant attempted to help Davidson flee the area to avoid apprehension and he initially lied to officers about his knowledge of Davidson's whereabouts. He allowed Davidson to stay hidden by going out himself to get food and bringing it to Davidson. In light of defendant's conduct beyond mere harboring, the Court finds that a base offense level of 30 is appropriate and, accordingly, defendant's Objection Ten is overruled.

---

[3]This tape was also introduced as Government's Exhibit 33 during the trial. [*See* Doc. 157.]

### 10.    Objection Eleven

Defendant objects to the portion of Paragraph 46 that claims the vehicle in question, valued at $14,000.00, was a loss on the basis that the vehicle in question was found and recovered intact. Thus, defendant argues, there was no monetary loss or loss of property.

The value of a loss is used to determine whether an offense level adjustment is appropriate. *See* U.S.S.G. § 2B3.1(b)(7)(B). Pursuant to Application Note 3 to U.S.S.G. § 2B3.1, "Loss means the value of the property taken, damaged or destroyed." Because the 4Runner was taken, it is considered a loss for the purpose of offense level adjustment despite being returned to the family. Accordingly, this objection is overruled.

### 11.    Objections Twelve and Fourteen

In Objections Twelve and Fourteen, defendant opposes the inclusion of charges for armed robberies in cases that were dismissed. Defendant argues that these charges were dismissed due to the State honoring the plea agreement in those cases. The government responded describing each of the dismissed robberies, and it presented police reports and defendant's statements relating to these robberies at the sentencing hearing.

Paragraphs 74 through 77, the subject of Objection Twelve, list dismissed charges. Federal Rule of Criminal Procedure 32(d)(2)(A) requires the presentence report to list defendant's history and characteristics including "any prior criminal record" and "any circumstances affecting the defendant's behavior that may be helpful in imposing sentence or correctional treatment." In imposing a sentence, it is proper for the Court to consider conduct that the Court concludes defendant actually committed based upon the evidence. *See*

24

*United States v. Fumes*, 248 Fed. App'x 593, 598 (5th Cir. 2007). If the government proves the defendant committed an offense alleged in a dismissed charge by a preponderance of the evidence, the Court may consider the dismissed charge for the purposes of sentencing. *See United States v. Azure*, 536 F.3d 922, 933 (8th Cir. 2008). Thus, it is proper for paragraphs 74 through 77 to be included in the PSR.

Paragraphs 105 through 108, the subject of Objection Fourteen, mention the dismissed charges against defendant as grounds for a possible upward departure. Pursuant to U.S.S.G. § 4A1.3(a)(1), "If reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, an upward departure may be warranted." Thus, the Court may consider conduct related to dismissed charges if the Court finds that information reliable, and it is proper for paragraphs 105 through 108 to be included in the PSR. Accordingly, defendant's Objections Twelve and Fourteen are overruled.

## 12.     Objection Thirteen

Defendant objects to Paragraph 78 of the PSR, stating that there are no details or commentary on any of the "infractions" listed, or any details as to any hearings on the "infractions" committed by defendant during his previous state incarcerations. However, contrary to defendant's contention, the information regarding defendant's "infractions" while incarcerated includes the nature of the infraction, the date, and the disposition. Accordingly, this objection is overruled.

## B.     Defendant's Motion for Downward Departure [Doc. 166]

Defendant moves for a downward departure pursuant to U.S.S.G. § 5K2.0 on the basis of substantial assistance.  Defendant argues that a downward departure is warranted because he assisted in the apprehension of Lemaricus Davidson.  Defendant submits that without his assistance, Davidson would not have been apprehended in anywhere near a timely fashion.  Defendant argues that a downward departure is permitted by U.S.S.G. § 5K2.0 (a)(2) which allows the Court to depart from the guideline range for circumstances not adequately taken into consideration by the guidelines.

The government responds [Doc. 168] that it is within the government's discretion whether to move for a downward departure for substantial assistance that involves the investigation or prosecution of another person.  *See United States v. Truman*, 304 F.3d 586 (6th Cir. 2002).  The government also argues that a defendant can only receive a downward departure for substantial assistance that involves the investigation or prosecution of another person pursuant to U.S.S.G. § 5K1.1 and not § 5K2.0.  The government also notes that defendant initially lied to law enforcement officials about Davidson's whereabouts and only gave them information once he was caught.  Thus, the government was not impressed by any cooperation by defendant and it exercised its discretion not to move for a downward departure under U.S.S.G. § 5K1.1.

Defendant replies [Doc. 169] that the Court has the authority to sentence a defendant below the guideline range when there exist aggravating or mitigating circumstances of a kind, or to a degree, not adequately taken into consideration by the sentencing commission

26

in formulating the guidelines. Defendant essentially modifies his motion to a request for a downward variance rather than a downward departure. Defendant states that he drew a map to Davidson's hiding place for law enforcement and warned officers that Davidson was armed. Defendant also contends that the government's contention that he did not provide assistance until he was caught is incorrect because defendant was questioned by police and then released.

The Court agrees with the government's arguments that only the government may move for a downward departure for substantial assistance that involves the investigation or prosecution of another person. Therefore, defendant's motion is denied to the extent that it requests a downward departure pursuant to U.S.S.G. § 5K2.0. However, a sentencing court may grant a variance after considering the § 3553 factors even when a guidelines-based departure based upon a considered factor is not appropriate. *See United States v. Davis*, 537 F.3d 611, 616-17 (6th Cir. 2008); *see also United States v. Hairston*, 502 F.3d 378, 386 (6th Cir. 2007). Thus, as the Court goes through the § 3553 factors, it will consider the conduct that defendant argues warrants a downward variance along with all other relevant conduct.

### C. Calculation of the Advisory Guideline Range

#### 1. Offense Conduct

Defendant was convicted of being an accessory after the fact of a carjacking that resulted in serious bodily harm and death, in violation of 18 U.S.C. § 3, and misprision of a felony, in violation of 18 U.S.C. § 4. Defendant's convictions for both of these crimes are grouped under U.S.S.G. § 3D1.2(b), because the counts involve the same victim and two or

27

more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan. Therefore, the highest offense level calculated for a single count will be used as the adjusted offense level.

The United States Sentencing Commission Guideline for being an accessory after the fact of a carjacking that resulted in serious bodily harm and death, in violation of 18 U.S.C. § 3, is found in U.S.S.G. § 2X3.1(a)(1). Pursuant to this section, the base offense level is calculated by using the underlying offense, and then subtracting six levels. Characteristics of the underlying offense that increases in the offense level are considered when calculating defendant's offense level if defendant could have reasonably known about the characteristics. However, pursuant to U.S.S.G. § 2X3.1(3)(A), the base offense level under this guideline shall not be more than 30.

The underlying offense is carjacking, which is found in U.S.S.G. § 2B3.1(a), and calls for a base offense level of 20. Defendant could have reasonably known that a firearm would be present, and possibly discharged. Therefore, the offense level is increased by seven levels, pursuant to U.S.S.G. § 2B3.1(b)(2)(A). Based upon it being reasonable that the defendant knew a firearm could be discharged, he would have known that the following specific offense characteristics related to the use of force would also apply. As permanent injury was suffered, the offense level is increased by six levels, pursuant to U.S.S.G. § 2B3.1(b)(3)(C). However, the maximum offense levels of these last two adjustments cannot exceed 11 levels. As the victims were abducted, the offense level is increased by four levels,

pursuant to U.S.S.G. § 2B3.1(b)(4)(A). The offense level is increased by two levels, as the offense involved a carjacking, pursuant to U.S.S.G. § 2B3.1(b)(5).

Defendant could have reasonably known that the 4Runner taken in the carjacking was valued at more than $10,000, but less than $50,000 (the value of the vehicle is approximately $14,000), and thus, the offense level is increased by one level, pursuant to U.S.S.G. § 2B3.1(b)(7)(B).[4] All of these increases result in a total offense level of 38.

However, pursuant to U.S.S.G. § 2B3.1(c)(1), "if a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States, apply § 2A1.1 (First Degree Murder)." The offense level pursuant to U.S.S.G. §2A1.1(a) is 43. The evidence at trial demonstrated that Both Channon Christian and Christopher Newsom were killed under circumstances that would constitute murder under 18 U.S.C. § 1111 and thus the offense level of 43 applies to the underlying crime of carjacking. After subtracting the six-level decrease for accessory after the fact pursuant to U.S.S.G. § 2A3.1, the base offense level would be 37. However, because the base offense level under U.S.S.G. § 2A3.1 is capped at 30, defendant's base offense level for the crime of being an accessory after the fact is 30.

The United States Sentencing Commission Guideline for misprision of a felony in violation of 18 U.S.C. § 2 is found in U.S.S.G. §2X4.1(a), and calls for a base offense level

---

[4]The Court notes that Paragraph 46 of the PSR states that defendant's offense level is increased by two levels based upon the value of the loss. The Court has consulted the probation office and determined that this was an error and the correct increase for a $14,000 loss is one level. The Court notes that this error in the PSR does not affect the guideline calculations.

of nine levels lower than the offense level for the underlying offense, but in no event less than four, or more than 19. As set forth above, the offense level for the underlying offense is 43, and nine levels from this is 34. Due to the offense level cap, defendant's offense level for misprision of a felony is 19. Because defendant's convictions for accessory after the fact and misprision of the felony are grouped under U.S.S.G. § 3D1.2(b), defendant's applicable offense level is 30.

### 2. Criminal History Points

The Guidelines instruct the Court on how many criminal history points to assign for each prior sentence of imprisonment. *See* U.S.S.G. § 4A1.1. Prior sentences are counted as a single sentence if they not separated by an intervening arrest and the sentences are imposed on the same day. *See* U.S.S.G. § 4A1.2(a)(2). However, under § 4A1.1(f), separate convictions within a single prior sentence can still receive one criminal history point if they resulted from a crime of violence that did not receive any criminal history points because they were treated as a single sentence. When applying § 4A1.1(f), a maximum of 3 points can be added.

Defendant's criminal history points stem from a series of robberies defendant committed between March and May 1994. The sentence imposed for all of these robberies is treated as a single sentence because they were not separated by an intervening arrest and defendant was sentenced for all of the robberies on the same day. Therefore, defendant receives three criminal history points for the first robbery conviction and one additional criminal history point for each of the other four robbery convictions imposed on the same day

30

up to the maximum of three. Thus, for all of defendant's 1994 five convictions, the defendant receives a total of six criminal history points. According to the Sentencing Table at U.S.S.G. Chapter 5, Part A, six criminal history points establish a criminal history category of III. The guideline range for a defendant with an offense level of 30 and a criminal history category of III is 121-151 months.

### 3. Under-Representation of Criminal History Points and Likelihood to Recidivate

An upward departure from the sentencing guidelines may be warranted, "[i]f reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3(a)(1); *see also United States v. Smith*, 505 F.3d 463, 471-72 (6th Cir. 2007). Section 4A1.3(a)(2) of the Guidelines sets forth the type of information the Court may consider, including prior sentences not used in computing criminal history, prior similar adult criminal conduct not resulting in a criminal conviction, and prior sentences of substantially more than one year imposed as a result of independent crimes committed on different occasions.

In this case, the Court finds that defendant's criminal history and likelihood to recidivate are under-represented due to his series of armed robberies. From the period of March 5, 1994 through May 20, 1994, defendant participated in nine armed robberies with many victims and was convicted of five of them. The charges for the other four were dismissed pursuant to a plea agreement and not due to insufficient evidence.

31

As stated before, it is proper for the Court to consider conduct alleged in a dismissed charge for the purposes of sentencing if the government proves the defendant committed that conduct by a preponderance of the evidence. *See United States v. Azure*, 536 F.3d 922, 933 (8th Cir. 2008). The Court has considered the evidence the government presented regarding the police reports and defendant's statements regarding the dismissed armed robbery charges. The Court finds by a preponderance of the evidence that defendant did commit the conduct alleged in the dismissed charges and therefore finds it proper to consider this conduct in fashioning a sentence in this case. Thus, the Court will consider the conduct related to all of defendant's armed robberies, including those for which defendant was convicted and those that were dismissed. The facts surrounding each of the robberies, as summarized below, have been set forth in the PSR, the government's Sentencing Memorandum [Doc. 170], and through testimony and evidence presented at the sentencing hearing:

### Favorite Mart, March 5, 1994

On March 5, 1994, defendant robbed a Favorite Market convenience store on Kingston Pike. Defendant, dressed in black, entered the store, displayed a semi-automatic pistol, demanded money, and threatened to "plug" the clerk if he did not hurry. There was one victim. The charges related to this conduct were dismissed and therefore defendant received no criminal history points for it.

### Town & Country Book Den, March 11, 1994

On March 11, 1994, defendant robbed the Town & Country Book Den on Clinton Highway. Defendant, donning a black jacket and a black ski mask, entered the bookstore

shortly before midnight, displayed a handgun, demanded and received money, and fled the store. While fleeing, a witness pulled into the parking lot and was confronted by defendant. Defendant fired six shots at the witness's vehicle striking it several times. There were seven victims. The charges related to this conduct were dismissed and therefore defendant received no criminal history points for it.

### J.T. Liquor Store, March 28, 1994

On March 28, 1994, defendant participated in the robbery of J.T. Liquor Store on Western Avenue. Defendant's co-defendant, dressed in black and wearing a black ski mask, entered the liquor store at around 9:15 p.m., brandished a pistol, demanded and received money, and fled. Defendant was the getaway driver. There was one victim. Because this offense is considered part of a single sentence, defendant only received one criminal history point for this conviction.

### Hardee's, March 31, 1994

On March 31, 1994, defendant robbed a Hardee's restaurant on Kingston Pike. Defendant entered the restaurant armed with a semi-automatic handgun, forced an employee to the back room at gunpoint to get money, and ordered everyone to the floor. There were four victims. Defendant received three criminal history points for this offense.

### Burger King, April 3, 1994

On April 3, 1994, defendant participated in the robbery of a Burger King on Kingston Pike. Defendant's co-defendant entered the restaurant armed with a handgun around 2:45 p.m., jumped the counter, and demanded all the money from the safe. He ordered everyone

to lay on the floor of the store and fled out a side door. Defendant was the getaway driver. There were seven victims. The charges related to this conduct were dismissed and therefore defendant received no criminal history points for it.

## Pizza Hut, April 20, 1994

On April 20, 1994, defendant robbed a Pizza Hut on Broadway. Defendant, wearing a blue bandana over his face, entered the restaurant shortly after 3:00 p.m., brandished a semi-automatic pistol, demanded money from the register, and fled. There were five victims. Because this offense is considered part of a single sentence, defendant only received one criminal history point for this conviction.

## Aztec, April 21, 1994

On April 21, 1994, defendant robbed an Aztec convenience store on Sutherland Avenue. Defendant entered the store armed with a black semiautomatic pistol and wearing a blue bandana over his face, and robbed four victims at gunpoint. While fleeing, defendant thought he saw the clerk reaching for the telephone, so he fired two shots in the clerk's direction. Because this offense is considered part of a single sentence, defendant only received one criminal history point for this conviction.

## Hardee's, May 5, 1994

On May 5, 1994, defendant robbed a Hardee's restaurant on Western Avenue. Defendant, wearing all black and a blue bandana over his face, entered the restaurant at around 2:33 p.m., brandished a pistol, and demanded money. Defendant fired shots into the ceiling of the restaurant. There were eight victims. The charges related to this conduct were

34

dismissed pursuant to the plea agreement and therefore defendant received no criminal history points for it.

<u>Walgreen's Pharmacy, May 20, 1994</u>

On May 20, 1994, defendant robbed a Walgreen's Pharmacy on Kingston Pike. Defendant and his co-defendant entered the store. Defendant was armed with a pistol and his co-defendant was armed with a pump shotgun. Defendant jumped the pharmacy counter, forced victims to lay face down on the floor, and demanded money from the pharmacy cash register. The co-defendant demanded money from the store's other cash registers. There were three victims. Because this offense is considered part of a single sentence, defendant only received one criminal history point for this conviction.

The Court finds that, based upon these instances of armed robbery, defendant's criminal history category substantially under-represents the seriousness of defendant's criminal history and the likelihood that defendant will commit other crimes in the future. The Court is particularly concerned by defendant's willingness to carry and discharge a firearm in places where multiple people were present and on multiple occasions. This shows the seriousness of defendant's criminal activity, his disregard for the safety of others, and that his criminal activity was not a one time occurrence.

**a.      Calculation of an Appropriate Upward Departure**

A defendant's advisory guideline range is calculated by determining his offense level and his criminal history category and using a grid to find the guideline range at the intersection of the two. The criminal history category makes up the horizontal axis of the

35

grid and the offense level makes up the vertical axis. The highest criminal history category is VI. Because the Court has determined that defendant's criminal history category substantially under-represents his criminal history and likelihood to recidivate, the Court must determine the appropriate upward departure. The Sentencing Guidelines Manual instructs the Court on how to calculate an upward departure. *See* U.S.S.G. § 4A1.3(a)(4).

If the defendant's criminal history category is less than VI and the Court determines an upward departure is warranted due to the inadequacy of defendant's criminal history category, the court must determine the extent of a departure by using, as a reference, the criminal history category applicable to defendants whose criminal history or likelihood to recidivate most closely resembles that of the defendant's. U.S.S.G. § 4A1.3(a)(4)(A). This results in a horizontal move across the grid.

If the defendant's criminal history category is VI and the Court determines an upward departure is warranted by the extent and nature of defendant's criminal history, "the court should structure the departure by moving incrementally down the sentencing table to the next higher offense level in Criminal History Category VI until it finds a guideline range appropriate to the case." U.S.S.G. § 4A1.3(a)(4)(B). This results in a vertical move down the grid since defendant's criminal history category is already at its maximum level.

### i.    Horizontal Move Across the Chart

The Court has found that defendant's criminal history category of III substantially under-represents the seriousness of defendant's criminal history and the likelihood that defendant will commit other crimes in the future. In determining the extent of the upward

36

departure, the Court will use the criminal history category applicable to defendants whose criminal history or likelihood to recidivate most closely resembles that of this defendant's.

Defendant received a total of six criminal history points, resulting in a criminal history category of III, for his convictions for the robberies of Hardee's restaurant on March 31, 1994; J.T. Liquor Store; Pizza Hut; Aztex; and Walgreen's Pharmacy because defendant's sentence for these convictions is considered a single sentence. Prior sentences are considered to be a single sentence if they not separated by an intervening arrest, and the sentences are imposed on the same day. However, defendant would have received 15 criminal history points, which amount to a criminal history category of VI, if his sentence for these convictions was not treated as a single sentence.

The Court finds that this criminal history category under-represents defendant's criminal history and likelihood to recidivate because defendant's conduct was not different from that of a defendant who was convicted of the same crimes but received separate sentences. Each of the five robberies occurred on different dates, at different times, at different locations, and involved numerous different victims. Many occurred during the day time hours, and on each occasion a firearm was brandished or used. The Court does not find the fact that defendant's convictions were adjudicated on the same day and not separated by an intervening arrest to be meaningful in terms of the seriousness of defendant's criminal history or his likelihood to recidivate.

Accordingly, the Court determines that defendant's criminal history and likelihood to recidivate closely resemble that of a defendant who received individual sentences for five

armed robberies and therefore received a total of 15 criminal history points. Thus, the Court finds that an upward departure to a criminal history category of VI is appropriate.

### ii.      Vertical Move Down the Chart

The Court additionally finds that even a criminal history category of VI under-represents defendant's criminal history and the likelihood that the defendant will commit other crimes due to the fact that defendant received no criminal history points for the dismissed charges related to defendant's 1994 robberies of Favorite Market; Town and Country; Burger King; Hardee's on May 5, 1994.

The charges related to these robberies were dismissed pursuant to a plea agreement and not due to insufficient evidence. As previously discussed, the Court finds that the government proved the offenses described in the dismissed charges by a preponderance of the evidence, and so it is proper to take this conduct into account. Because these dismissed charges demonstrate that a criminal history category of VI under-represents defendant's criminal history and likelihood to recidivate, the Court will structure the departure by moving incrementally down the sentencing table to the next higher offense level in criminal history category VI until it finds a guideline range appropriate to this case. In doing so, the Court finds that a move one level down, with a resulting structured advisory guideline range of 188 to 232 months' imprisonment, is appropriate in this case.

The Court finds that defendant's criminal history is serious and his likelihood to recidivate is high, and thus, an upward departure to the structured advisory guideline range of 188 to 232 months' imprisonment is warranted. This guideline range most adequately

38

represents the criminal history of those defendants, like the defendant in this case, who commit numerous violent crimes, by brandishing and discharging firearms, and placing many victims in fear of their lives. Finally, the Court notes that the statutory maximum term of imprisonment for Counts One and Two of the indictment is 216 months. Thus, defendant's effective structured advisory guideline range that the Court will apply in this case is from a low end of 188 to a high end of 216 months.

### D.    Consideration of the § 3553 Factors

#### 1.    Nature/Circumstances of Offense

The jury found the defendant guilty of the two counts charged in the indictment in this case. Count One charged defendant with being an accessory after the fact of carjacking; specifically, from January 10, 2007, through on or about January 11, 2007, in the Eastern District of Tennessee, defendant, knowing that an offense against the United States had been committed, that is, a carjacking which resulted in death and serious bodily injury to another person, did receive, relieve, comfort and assist one of the offenders, Lemaricus Davidson, in order to hinder and prevent the offender's apprehension trial and punishment. Count Two charged defendant with misprision of a felony; specifically, from on or about January 10, 2007, through on or about January 11, 2007, in the Eastern District of Tennessee, defendant, having knowledge of the actual commission of a felony, that is, a carjacking which resulted in death and serious bodily injury to another person, did conceal the same, and did not as soon as possible make known the same to the appropriate authorities.

39

The nature and circumstances of defendant's conduct in relation to these charges are serious. Defendant did not just allow Davidson to stay in his own home but sought shelter and actively hid in at least three locations with Davidson. One of these locations was a vacant residence that defendant and Davidson broke into in a manner in which defendant could have been convicted of burglary. Defendant sought methods of flight for Davidson from at least two parties at two separate times. Defendant provided Davidson with a cellular telephone and set up and utilized a coded communication system between himself and Davidson. Defendant brought food to Davidson while he was in hiding. Although defendant ultimately gave officers the address of where Davidson was hiding, defendant initially lied to the police about his knowledge of Davidson's whereabouts. Defendant did all these things after having actual and constructive knowledge of Davidson's involvement in the carjacking. Additionally, defendant was the only person willing to actively help, or continue to help, Davidson avoid apprehension after learning of Davidson's involvement in the underlying crimes.

Although defendant provided assistance to police in the form of drawing a map to Davidson's location, warning officers that Davidson was armed, and giving statements during the police interrogation, the Court does not find that these actions, balanced against all of defendant's other conduct, warrant the Court's leniency. In addition to all of the activities just discussed, defendant had the opportunity to go to police sooner on his own initiative but chose not to do so. Though defendant argued that he had not been "captured"

when he disclosed the whereabouts of Davidson because he was later released, he had been stopped and questioned by police.

The Court also notes that defendant's statement at the sentencing hearing that he did not know that Davidson was involved in the underlying crimes until they were in the Reynolds Street house is contrary to the weight of the evidence. The Court reiterates its previous finding that the government has proved by a preponderance of the evidence that defendant knew about Davidson's involvement in the underlying crimes at an earlier time.

In considering the nature and circumstances of the crimes of which defendant was convicted, the nature and circumstances of the underlying federal crime, that being the carjacking resulting in death and serious bodily injury, are also relevant. The Sentencing Commission recognizes the relevance of the underlying federal crime as is evidenced by its effect on the appropriate offense level and resulting guideline range for the offenses for which this defendant is to be sentenced. *See* U.S.S.G. §§ 2X3.1(a)(1); 2X4.1(a). The applicable offense level for accessory after the fact and misprision of a felony is calculated by first determining the offense level of the underlying offense and then subtracting six levels for accessory after the fact and nine levels for misprision of a felony. Thus, the more serious the underlying offense, the higher the guideline range for the crimes of accessory after the fact and misprision of a felony will be.

The underlying crime was horrific in nature. As more specifically discussed in Paragraphs 16-23 of the PSR, Channon Christian and Christopher Newsom were abducted,

41

tortured, and brutally killed. The nature and circumstances of the underlying federal crime are accordingly taken into account by the Court in its review of the § 3553 factors.

## 2. History and Characteristics of the Defendant

The defendant is 36 years old, and he has been involved in the criminal justice system since the age of 14. As already found by the Court, the defendant's criminal history is particularly egregious. During the spring of 1994, at the age of 22, the defendant was arrested for nine separate instances of robbery. One of those instances also included attempted murder, attempted murder during the commission of another felony, and attempted aggravated robbery. There were multiple victims in most of these robberies, and on each occasion, either the defendant or his co-defendant was armed with a handgun. On two occasions, the defendant discharged a firearm. Several of the robberies occurred during the middle of the day, and took place at fast food restaurants and other places where people congregate, thus putting many people at risk.

The defendant recalled attending part of the 9th grade at Rule High School, which has since closed. He reports no problems reading or writing. The defendant has a limited history of verifiable employment. He has never married, and has no children.

The defendant has a long history of alcohol and drug abuse. Defendant began using alcohol and marijuana at the age of 12 and LSD, psychedelic mushrooms, and acid at the age of 16. His drug of choice continues to be marijuana and prior to his arrest, he was consuming four to five quarts of alcohol and taking two to four narcotic pain pills per day. As set forth

42

in Paragraph 85 of the PSR, the only treatment defendant has received was a drug education class while serving his state sentence.

### 3. Need for Sentence Imposed to Reflect Seriousness of the Offense

Both of the crimes for which defendant was found guilty are serious federal offenses, and the breaking of these laws can and do have serious consequences, resulting in significant statutory penalties for such crimes. Here, as noted, defendant actively and steadfastly attempted to assist Davidson in numerous ways, including the active participation in attempts to assist Davidson in the commission of a burglary, and attempting to obtain transportation in an effort to assist Davidson in fleeing from this area.

The Court, in assessing the seriousness of the offense, also considers what could have happened if the defendant was successful in obtaining transportation for Davidson out of the area or in helping Davidson to remain hidden. Davidson, and potentially the other co-defendants, could have committed additional violent crimes, and defendant's conduct would have essentially facilitated those crimes. The Court therefore finds defendant's culpability in this case to be serious and significant, and believes it necessary to fashion a sentence to reflect the seriousness of the offenses for which defendant has been found guilty.

### 4. Provide Just Punishment and Promote Respect for the Law

For similar and additional reasons, the Court finds a need for the sentence imposed to provide just punishment and promote respect for the law. These reasons include the Court's review and discussion of defendant's criminal history. Simply put, defendant's overall history shows a lack of respect for the law, inclusive not only of the egregious

43

criminal history already discussed by the Court, but also of the defendant's multiple infractions while serving his term of imprisonment in the Tennessee Department of Corrections. As set forth in Paragraph 78 of the PSR, these infractions include assault, failure to report as scheduled, refusal of direct orders, positive drug screens, personal property violations, and threatening of an employee. In short, even when defendant has been incarcerated for failure to follow the law, he has failed to follow the law.

### 5. Afford Adequate Deterrence

The Court must next consider the need for the sentence imposed to act as both specific deterrence to this defendant and as general deterrence to those who may contemplate similar crimes in the future. *See United States v. Turner*, 173 Fed. App'x 402, 407-08 (6th Cir. 2006) (cited in *United States v. Phinazee*, 515 F.3d 511, 515-16 (6th Cir. 2008) (noting that a sentencing court's authority is not limited to considering specific deterrence and that it is also appropriate to consider general deterrence). As to this defendant, considering the nature and circumstances of the offense and the history and characteristics of this defendant, including but not limited to his criminal history, the Court finds a high need for the sentence imposed to afford adequate deterrence. Specifically, it is necessary to separate the defendant from the public to inhibit his ability to commit future crimes and cause harm to the public. In other words, given the likelihood of recidivism by this defendant, a lengthy period of incarceration is the acceptable method to deter defendant from future criminal conduct.

The Court must also be mindful of the need for a sentence imposed to act as general deterrence–i.e., to deter others from undertaking crimes similar to defendant's crimes in the

future.  In other words, to operate as general deterrence, the sentence fashioned should serve as a reminder to others not to hinder and prevent a known offender's apprehension and not to conceal the same, but rather to make it known as soon as possible to the appropriate authorities.

### 6.    Protect Public From Further Crimes of Defendant

Based upon the nature and circumstances of the instant offenses, and defendant's particularly egregious criminal history, this category is among the most compelling ones when it comes to fashioning a sentence in this case.  Defendant has a demonstrated capacity for violence, and there is little doubt the community needs to be protected from the crimes of this defendant.

Though defendant argues that his previous crimes should be discounted because they occurred over fourteen years ago, the Court notes that defendant has not had a clean record since then as defendant incurred multiple infractions while in prison.  Defendant was only released from prison in 2003, and, by defendant's own admission and the testimony at trial, has engaged in criminal activity since that time, though uncharged.  In particular, at the sentencing hearing, defendant stated that he went over to the Chipman Street house on January 7, 2007 to bring marijuana because "that's what we do" and he went to Danielle Lighfoot's apartment with Davidson to smoke marijuana.  Because defendant has demonstrated that he continues to be willing to break the law, and he has a propensity for violence and disregard for the safety of others, the Court finds that the need to protect the public from further crimes of defendant is very high.

45

### 7.    Need to Avoid Sentence Disparities

The advisory guidelines are intended, in part, to carry out the national policy, as articulated by Congress, that sentences be uniform across the country to the extent possible and be based on the offender's actual conduct and history.  *See United States v. Simmons*, 501 F.3d 620, 623-24 (6th Cir. 2007).  Here, the Court upwardly departs from the advisory guideline range to the structured advisory range as discussed in Section III.C above in order to avoid a sentencing disparity between this defendant and other defendants who commit similar crimes and have similar criminal history.

### 8.    Need to Provide Restitution

The Court does not find this factor applicable in this case as that term is utilized in 18 U.S.C. § 3553.

## IV.    Conclusion

In light of the discussion above, including the capped structured advisory guideline range and the relevant 18 U.S.C. § 3553 factors, and considering the arguments of the government and defendant, the PSR, and the record as a whole in this case, the Court will impose a sentence of 216 months consisting of the statutory maximums of 180 months as to Count One and 36 months as to Count Two, such terms of imprisonment to run consecutively.  For all the reasons discussed already, the Court finds that this sentence is sufficient, but not greater than necessary to comply with the purposes of 18 U.S.C. § 3553.  Additionally, in light of the factors discussed and the sentence imposed, the Court denies defendant's request for a downward variance.

Pursuant to 18 U.S.C. § 3553(c)(1), the court notes that it finds a sentence at the high end of the capped structured advisory guideline range justified in this case based upon the defendant's extensive criminal history and the Court's belief that such a sentence adequately reflects the seriousness of the instant offense as well as protects the public from further crimes being committed by the defendant. The other conditions imposed at the sentencing hearing are incorporated herein.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE