UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
v.                             )      No.:   3:07-CR-3
                               )             (VARLAN/GUYTON)
ERIC DEWAYNE BOYD,             )
                               )
            Defendant.         )

**MEMORANDUM OPINION AND ORDER**

This criminal matter is before the Court on defendant Eric Dewayne Boyd's

("Boyd's") Motion for a New Trial Based on Newly Discovered Evidence and Motion to Poll

the Jury on What Difference the Documents Withheld from the Defense Would Have Had

in their Deliberations and Verdict (the "Motion") [Doc. 184]. In his Motion, Boyd seeks a

new trial on the basis of newly disclosed documents pursuant to Federal Rule of Criminal

Procedure 33(b) and violations of *Brady*[1] and *Giglio*.[2] Boyd also requests that defense

counsel be allowed to question the jury regarding the disclosed documents and a hearing at

which proof will be taken. The United States has responded in opposition [Doc. 187]; Boyd

has not filed a reply. For the reasons that follow, Boyd's requested relief in the Motion will

be denied, including: Boyd's request for a new trial; Boyd's request to question the jury; and

Boyd's request for a hearing.

---

[1]*Brady v. Maryland*, 373 U.S. 83 (1963).

[2]*Giglio v. United States*, 405 U.S. 150 (1972).

## I. Procedural Background

On April 16, 2008, a jury convicted Boyd of two counts contained in the second superseding indictment [Doc. 106]. Count One charged Boyd with being an accessory after the fact to a carjacking that resulted in serious bodily harm or death, a violation of 18 U.S.C. § 3. Count Two charged Boyd with misprision of a felony, a violation of 18 U.S.C. § 4.[3] On November 18, 2008, the Court imposed a sentence of 216 months, consisting of the statutory maximums of 180 months as to Count One and 36 months as to Count Two, sentences to run consecutively [Doc. 174].[4] On November 18, 2008, Boyd filed a *pro se* notice of appeal to the United States Court of Appeals for the Sixth Circuit [Doc. 175].

On February 23, 2009, the government notified the Court that it was disclosing three potentially impeaching documents prepared by special agents following law enforcement investigative interviews of two trial witnesses for the government, Xavier Jenkins ("Jenkins") and Aminata Bangura ("Bangura") [Doc. 181]. Specifically, the disclosed documents are: (1) a law enforcement "report of interview" relevant to the trial testimony of Jenkins (the "Jenkins ROI") [Doc. 181-1]; (2) the special agent's underlying rough notes from his interview of Jenkins (the "Jenkins Rough Notes") [Doc. 181-2]; and (3) a law enforcement "report of interview" relevant to the trial testimony of Bangura (the "Bangura ROI") [Doc. 181-5]. The government also filed an affidavit (the "Moore Affidavit") by David W. Moore

---

[3]These charges are from the two-count second superceding indictment [Doc. 106], returned by a federal grand jury on October 16, 2008.

[4]18 U.S.C. § 3 has a statutory maximum penalty of 15 years' imprisonment and 18 U.S.C. § 4 has a statutory maximum penalty of 3 years' imprisonment.

2

("Agent Moore"), the special agent who interviewed Jenkins, took the Jenkins Rough Notes, and prepared the Jenkins ROI; an affidavit by Rebecca Bobich (the "Bobich Affidavit"), the special agent who interviewed Bangura and prepared the Bangura ROI; and an affidavit by Jenkins (the "Jenkins Affidavit") regarding his interview with Agent Moore [Docs. 181- 3, 181- 4, 181- 6]

Boyd filed the Motion [Doc. 184] on April 30, 2009, alleging that the disclosure, almost a year after trial,[5] of documents in the possession of the government at the time of the trial, constitutes a violation of *Brady* and *Giglio*. Boyd argues that the documents are material and exculpatory and contain impeachment and credibility information that raises serious questions about the government's witnesses and the integrity of the government's case and its investigation. The government responded in opposition [Doc. 187], and Boyd has not filed a reply.

## II.     Relevant Trial Evidence and Testimony

On the night of January 6, 2007, Christopher Newsom ("Newsom") and his girlfriend, Channon Christian ("Christian"), left a friend's apartment in Christian's silver Toyota 4-Runner (the "4-Runner"). At some point that night, the couple was abducted. Sometime after this abduction, Newsom was tied up, gagged, shot, and his body burned and thrown by the Norfolk Southern Railroad tracks where it was discovered on January 7, 2007.

---

[5]Boyd's trial, held before United States District Judge Thomas A. Varlan, was conducted on April 7, 2008 through April 16, 2008. The documents at issue were disclosed by the government on February 23, 2009 [Doc. 181].

On January 8, 2007, investigators found Christian's 4-Runner near Chipman Street. A fingerprint found inside the 4-Runner was identified as belonging to Lemaricus Davidson ("Davidson"), who had a residence at 2316 Chipman Street. A search warrant was obtained, and, on January 9, 2007, investigators entered Davidson's Chipman Street residence and discovered Christian's body in a trash can. Christian had been violently raped, sodomized, and had died from positional asphyxiation as a result of being put into the trash can.

On January 17, 2007, a federal grand jury returned a seven-count indictment charging Davidson, Letalvis Cobbins ("Cobbins"), George Thomas ("Thomas"), and Boyd with numerous charges relating to the above incidents. On March 8, 2007, the indictment as to Davidson, Cobbins, and Thomas was dismissed.[6] On August 23, 2007, a federal grand jury returned a superceding indictment charging Boyd with being an accessory to a carjacking, resulting in serious bodily injury to another person, and misprision of a felony. A second superceding indictment, modified only slightly, was returned on October 16, 2007. On April 10, 2008, the case proceeded to trial.

The government's first substantive witness was Jenkins, an employee of Waste Connection, a business located near Davidson's Chipman Street residence. Jenkins testified that early on January 7, 2007, at approximately 1:30 A.M., he saw a 4-Runner, later identified to be Christian's, in front of the Chipman Street residence. Parked behind the 4-Runner was a white car. Jenkins testified that the lights were on and there appeared to be a

---

[6]The federal charges against defendants Davidson, Cobbins, and Thomas were dismissed in favor of state prosecutions.

lot of activity at the residence. Jenkins also testified that he saw four black males drive by in the 4-Runner. At trial, Jenkins identified the white car from a vehicle lineup. The testimony of Nicole Mathis ("Mathis"), Boyd's cousin, established that the white car identified by Jenkins in the vehicle lineup belonged to her. Both the government and defense counsel questioned Jenkins about the white car and Jenkins testified that he was a hundred percent sure it was the one later identified as belonging to Mathis.

Mathis testified that she loaned Boyd her car, a white Pontiac Sunbird, on either January 4 or January 5, 2007, and that she did not get it back until January 8, 2007. On January 8, 2007, Mathis went to retrieve her car from Boyd's mother's apartment. The car was broken so Mathis did not take it, but only collected some personal items from inside it. Mathis testified that she discovered a plastic bag containing small bullets underneath the front passenger seat. Mathis stated that she knew nothing about the bullets and discarded them. Mathis also testified that she heard Boyd say, as he was talking on a cell phone outside his mother's apartment, that "I might be in some trouble."

Trial testimony also established that on January 7, 2007, Davidson went to his girlfriend's apartment, Daphne Sutton ("Sutton"), arriving in a 4-Runner, but left shortly after. Sutton later picked up Davidson and he stayed at her apartment through January 8, 2007. On January 9, 2007, Sutton learned of the discoveries of the bodies of Newsom and Christian and, at approximately 5:00 P.M., told Davidson to leave. Sutton dropped Davidson off in the area of the Ridgebrook Apartment complex.

Danielle Lightfoot ("Lightfoot") testified that on the evening of January 9, 2007, Davidson and Boyd came to her apartment and asked to stay the night; Lightfoot consented. Kevin Armstrong ("Armstrong") testified that, in response to a telephone call from Boyd, he came to Lightfoot's apartment at approximately 11:30 P.M. on January 9, 2007. Armstrong testified that he was surprised to see Davidson because he had heard about the discovery of the body at Davidson's residence. Armstrong testified that he left Lightfoot's apartment, but that Boyd and Davidson continued to call him for assistance in helping get Davidson out of town. Armstrong testified that he stopped answering his phone. Phone records introduced at trial confirmed that several phone calls were made from Boyd's cell phone to Armstrong's phone.

Around 12:00 P.M. on January 10, 2007, Lightfoot saw news coverage of the discovery of Christian's body at the Chipman Street residence. Both Boyd and Davidson were present when Lightfoot saw this news coverage. Lightfoot told Boyd and Davidson to leave her apartment. At 9:30 P.M. Boyd and Davidson went to a nearby wooded area where Boyd called several people to try and arrange transportation for Davidson away from the area. At one point, Boyd walked to the nearby apartment of LaKeisha and Leesa Greer in an attempt to get assistance; they refused.

At 3:30 A.M. on January 11, 2007, Boyd and Davidson broke into a vacant house on Reynolds Street. At 5:30 A.M., Boyd left the Reynolds Street house and went to his mother's apartment. At 9:00 A.M., Boyd went to Kamara Bangura's ("Kamara's") apartment, located upstairs from Boyd's mother's apartment, and used Kamara's cell phone

to call his own cell phone, which he had left with Davidson. Kamara's young daughter, Amianta Bangura ("Bangura") was also at the apartment and was in the room at the time Boyd used her mother's cell phone. Cell phone records introduced at trial confirm that Kamara's cell phone called Boyd's cell phone several times that morning. At approximately 10:00 A.M., Leesa Greer saw Boyd back in the area of Ridgebrook Apartments holding a McDonald's bag.

At approximately 1:30 P.M. on January 11, 2007, Boyd was stopped by police officers and asked if he knew where Davidson was. After initially denying that he knew, Boyd gave the officers the address of the Reynolds Street house. At approximately 4:00 P.M., Davidson was found and taken into custody. Boyd's cell phone, a revolver, Newsom's tennis shoes, and a McDonald's bag were found along with Davidson in the Reynolds Street house. At trial, the owner of the house testified that none of those items were in the house prior to the break-in. At 4:15 P.M., Boyd went to Lightfoot's apartment and told her that Davidson had been taken into custody. Boyd was picked up by the police at approximately 5:00 P.M. after some of the other defendants named him as having been involved in the carjacking and murders.[7]

## III.    Applicable Law

Boyd's Motion is brought pursuant to Federal Rule of Criminal Procedure 33(b) and Boyd's allegations that the government violated its obligations under *Brady* and *Giglio*.

---

[7] Thomas and Cobbins were apprehended in Kentucky on January 11, 2007. Both were returned to Knoxville, Tennessee.

Boyd's argument centers on what he maintains was the government's improper withholding of *Brady* materials that could have been used at trial to impeach the testimony of Jenkins and Bangura. Boyd alleges that the government knew that Jenkins' and Bangura's pre-trial investigative statements were markedly different from their testimony at trial. Boyd argues that if these documents had been disclosed to the defense prior to trial, defense counsel would have been able to impeach the truthfulness and credibility of Jenkins and Bangura at trial and there exists a reasonable probability that the result of the trial would have been different. Therefore, Boyd concludes, the government's failure to disclose the documents deprived Boyd of due process of law and undermines all confidence in the verdict of the jury and therefore a new trial is warranted. Boyd also argues that because the Court relied on Jenkins' trial testimony in determining Boyd's sentence, such reliance deprived Boyd of a fair sentencing.

### A.     Federal Rule of Criminal Procedure 33(b)

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. Whether to grant a Rule 33 motion is left to the sound discretion of the district court. *United States v. Wheaton*, 517 F.3d 350, 361 (6th Cir. 2008). In a Rule 33 motion, the defendant bears the burden of proving that a new trial should be granted. *United States v. Davis*, 15 F.3d 526, 531 (6th Cir. 1994). Boyd bases his Motion for a new trial on grounds of newly discovered evidence. Fed. R. Crim. P. 33(b). To obtain a new trial on this basis, a defendant must show that: (1) the new evidence was discovered after the trial; (2) the

8

evidence could not have been discovered earlier with due diligence; (3) the evidence is material and not merely cumulative or impeaching; and (4) the evidence would likely produce an acquittal. *United States v. O'Dell*, 805 F.2d 637, 640 (6th Cir. 1986); *see United States v. Barlow*, 693 F.2d 954, 966 (6th Cir. 1982), *cert. denied*, 461 U.S. 945 (1983).

### B. *Brady* and *Giglio*

A defendant may frame a request for a new trial under both Federal Rule of Criminal Procedure 33 and *Brady*. *See United States v. Jones*, 399 F.3d 640, 648 (6th Cir. 2005). To establish a violation of *Brady*, a defendant has the burden of showing that "the Government suppressed evidence, that such evidence was favorable to the defense, and that the suppressed evidence was material." *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007). "Material" evidence means "that there is a reasonable probability that, had the evidence been disclosed to the defense, the outcome would have been different," and "reasonable probability" means "a probability sufficient to undermine confidence in the verdict." *Jones*, 399 F.3d at 648 (internal quotations and citation omitted). As the United States Supreme Court has stated, "the question is not whether the defendant would more likely than not have received a different verdict with the suppressed evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Strickler v. Greene*, 527 U.S. 263, 289-90 (1999) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). Accordingly, a defendant must prove a *Brady* violation "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. When

9

the government suppresses evidence that falls under *Brady*, such suppression violates due process when the evidence is favorable to the accused and "material" to guilt or innocence, regardless of the good faith or bad faith of the prosecution. *Id.* at 432; *see Brady*, 373 U.S. at 87.

A violation of *Giglio* occurs when the government fails to disclose evidence affecting the credibility of a witness whose "reliability . . . may well be determinative of guilt or innocence." *Giglio*, 405 U.S. at 153-54 (quotations omitted). Materials under *Giglio* that may be used to impeach a witness fall within the *Brady* rule because such evidence is considered "favorable to the accused." *United States v. Bagley*, 473 U.S. 667, 676 (1985) (quoting *Brady*, 373 U.S. at 87). Impeachment evidence may be considered "material" for purposes of *Brady* when the government's case depends almost entirely on a witness's testimony, without which, there could have been no indictment and no evidence to carry the case to a jury. *See Giglio*, 405 U.S. at 154-55. Impeachment evidence that goes to the truthfulness and reliability of a given witness is also material where the witness supplied the only evidence of essential facts directly material to the guilt or innocence of a defendant. *See Coleman v. Maxwell*, 273 F. Supp. 275, 280 (D.C. Ohio 1967); *Napue v. People of Illinois*, 360 U.S. 264 (1959).

### C.     Standards for Granting a New Trial

The standards for a new trial under Federal Rule of Criminal Procedure 33 and under *Brady* are different, with the Rule 33 standard being more stringent. *See United States v. Frost*, 125 F.3d 346, 382 (6th Cir. 1997) (noting the different degrees of burdensomeness

10

required by the two standards). Under Rule 33, a defendant must show that the newly

discovered evidence "would likely produce an acquittal." *See O'Dell*, 805 F.2d at 640.

Under *Brady*, a defendant need only show that the withheld evidence at issue is "material."

*See Graham*, 484 F.3d at 417. Because *Brady* requires a defendant to meet a more lenient

standard, the Court will first analyze Boyd's claim of *Brady* and *Giglio* violations.

## IV. Analysis

### A. Alleged Violations of *Brady* and *Giglio*

#### 1. The Jenkins Rough Notes, the Jenkins ROI, and Jenkins' Trial Testimony

Jenkins testified at trial that he arrived at work near the Chipman Street residence at

around 12:30 A.M. on January 7, 2007 [Doc. 159, Tr. Vol. 1, p. 64-65]. After clocking in,

around 2:00 A.M., Jenkins testified that he saw the 4-Runner parked in front of the residence

[*Id.*, pp. 64, 67-70]. Jenkins also testified that there was a white car parked behind the 4-

Runner [*Id.*, pp. 77-78]. At trial, Jenkins identified a white car in a vehicle line-up [*Id.*, pp.

78-81]. Mathis' testimony established that the white car identified by Jenkins belonged to

her and was on loan to Boyd at the time [*Id.*, pp. 92-94]. Both the government and the

defense questioned Jenkins about the white car and Jenkins testified that he was a hundred

percent sure the white car in the vehicle line-up was the same one he saw [*Id.*, p. 82]. Jenkins

also testified that the lights were on at the Chipman Street residence, that there appeared to

be a lot of activity at the residence, and that he later saw four black males drive by in the 4-

Runner [*Id.*, pp. 66-67, 68-69].

11

The Jenkins ROI and the Jenkins Rough Notes contain several inconsistencies with Jenkins' trial testimony. The Jenkins Rough Notes state that Jenkins "could not describe any additional vehicle" besides the 4-Runner [Doc. 181-1, "Jenkins Rough Notes"]. In contrast, at trial, Jenkins testified that he saw and could describe a white car. The Jenkins ROI also states that Jenkins told Agent Moore that he arrived at work at around 1:45 A.M., a later time than the time Jenkins testified to at trial [Doc. 181-1, "Jenkins ROI"]. Further, the Jenkins ROI states that Jenkins told Agent Moore that the driver of the 4-Runner was wearing a "tan or gray cap" [Doc. 181-1, "Jenkins Rough Notes"]. However, at trial, Jenkins described the driver as wearing something "with a hood" [Doc. 159, Tr. Vol. 1, p. 74]. Finally, in the Jenkins ROI, Agent Moore reported that Jenkins described the activity level around the residence as not unusual [Doc. 181-1, "Jenkins ROI"]. At trial, Jenkins testified that there was "traffic going in and out" and the residence "seemed pretty busy" [Doc. 159, Tr. Vol. 1, p. 69].

### 2. Analysis of the Jenkins Rough Notes, the Jenkins ROI, and Jenkins' Trial Testimony

After a review of the Jenkins ROI, the Jenkins Rough Notes, the Moore Affidavit, the Jenkins Affidavit, and the trial transcript, the Court concludes that the inconsistency with the most impeachment value is the inconsistency regarding the presence (or absence) of any additional cars at the Chipman Street residence on the morning of January 7, 2007, and Jenkins' ability to describe such cars. Jenkins' testimony about the white car was important to the government's theory of the case because it permitted the inference that Boyd knew

12

about the underlying offenses at an earlier time than Boyd had maintained.[8] The government also referred back to Jenkins' testimony about the white car in its closing argument, reiterating to the jury that Jenkins was a hundred percent sure that it was the same white car identified by Mathis and asking the jury to infer that the presence of the white car meant Boyd had knowledge of the carjacking on January 7, 2007 [Doc. 162, Tr. Vol. 4, p. 11]. While the Court agrees that the Jenkins Rough Notes and the Jenkins ROI would have given defense counsel some assistance in cross-examining Jenkins, such as calling into question Jenkins' observation and descriptions of the white car, in light of all the evidence produced at trial, the Court determines that the impeachment value of this inconsistency would have been minimal.

Agent Moore's interview with Jenkins was less than a week after the bodies of Christian and Newsom were discovered, and was conducted at a time when law enforcement agents were focused on Jenkins' knowledge and ability to describe the 4-Runner, not the white car. This is consistent with the detail with which Agent Moore questioned Jenkins about the appearance of the 4-Runner and its occupants [*See* Doc. 181-3, "Moore Affidavit," Doc. 181-1, "Jenkins ROI"].[9] Additionally, in the Moore Affidavit, Agent Moore states that he did not question Jenkins about the presence of other cars at the Chipman Street residence

---

[8]Boyd stated at his sentencing hearing that he did not know that Davidson was involved in the underlying crimes until the two broke into the Reynolds Street house on January 11, 2007 [*See* Doc. 174].

[9]The Jenkins ROI describes the 4-Runner and its occupants in considerable detail [Doc. 181-1, "Jenkins ROI"]. The descriptions in the Jenkins ROI of the occupants and the description of the exterior of the 4-Runner are largely consistent with Jenkins' testimony at trial.

because "[a]t the time of the interview, I [Agent Moore] was unaware that other vehicles besides the silver 4-Runner might have been important to this investigation" [Doc. 181-3, "Moore Affidavit"]. Agent Moore also states that, upon his review of the Jenkins Rough Notes and the Jenkins ROI, his statement in the Jenkins ROI that Jenkins "could not describe any additional vehicle" was not based on any factual information but was included because "it seemed to be a natural way to complete the report" [*Id.*, Doc. 181-1, "Jenkins ROI"]. In the Jenkins Affidavit, Jenkins confirms that Agent Moore did not ask him to describe any other cars during the interview [Doc. 181-1, "Jenkins Affidavit"].

Jenkins' testimony describing the white car is not only inconsistent with the Jenkins ROI, but the Jenkins ROI and the Jenkins Rough Notes are also inconsistent. In the Jenkins Rough Notes, taken on January 15, 2007, Agent Moore noted that Jenkins "[s]aw other cars in general area @ house." [Doc. 181-2, "Jenkins Rough Notes"]. In the Jenkins ROI, prepared on January 31, 2007, Agent Moore noted that Jenkins "maybe [saw] an additional vehicle or two" but "he could not describe any additional vehicle." [*Id.*]. This inconsistency between the two documents indicates that the documents are not completely accurate, verbatim transcripts of Agent Moore's interview with Jenkins, thus supporting Agent Moore's statement that his recollection of his interview with Jenkins was incorrect and that he overgeneralized some of his statements in the Jenkins ROI.

Jenkins' testimony at trial was also consistent with Jenkins' statement in his affidavit that he described the white car for the first time when prompted by Assistant United States

Attorney Tracy Stone ("AUSA Stone") [Doc. 159, Tr. Vol 1, pp. 77-78, 88-89].[10] Jenkins stated in his affidavit that he was not asked to describe other cars at the Chipman Street residence until he was interviewed by AUSA Stone in preparation for trial [Doc. 181-1, "Jenkins Affidavit"]. Further, Jenkins states that he did not provide information about the white car in his initial interview with Agent Moore because Agent Moore did not ask him to describe any other vehicles [*Id.*].[11]

It would be reasonable to contemplate a situation in which a witness does not recall all the details of an incident until later, when being questioned about specific, yet seemingly normal details. As investigations and trials progress, details that were once minor and insubstantial take on greater meaning and can develop into important pieces of evidence. Lay witnesses will often not describe all aspects of a scene but focus on parts they perceive as being the most important. Only as case preparation proceeds towards trial do attorneys

---

[10]At trial, Jenkins testified that the first time he described the white car was when AUSA Stone interviewed him [Doc. 159, Tr. Vol. 1, pp. 77-78, 88]. Jenkins also stated that prior to this interview with AUSA Stone, he had never seen any photograph of any white car in connection with this case and no one had ever told him anything about a white car that might make him think it would be important to this case [*Id.*, pp. 78, 88].

[11]Boyd points out that there was a flyer showing a picture of the white car, including a written description of the red pinstripe, distributed by ATF agents around Chipman Street on January 14, 2007, a day before Agent Moore's interview with Jenkins [Doc. 181]. The flyer asked the public to call the police if they had information about the white car [*Id.*]. Boyd then concludes that it is "impossible to believe" that Agent Moore did not ask Jenkins about the white car [*Id.*]. The Court does not agree. Among other things, the Court notes that Jenkins testified at trial that Agent Moore did not question him about the white car, a statement Jenkins reiterated in his affidavit, and Agent Moore also stated in his affidavit that he did not ask Jenkins about a white car. Further, these statements were taken under oath, and neither the Jenkins Rough Notes nor the Jenkins ROI have Jenkins stating explicitly that he *did not* observe a white car.

15

narrow their questions down to the core, essential facts necessary to their theories. Such a situation seems to have been what transpired in this case, given the statements in the Jenkins Rough Notes, the Jenkins ROI, Jenkins' trial testimony, and the affidavits of both Agent Moore and Jenkins. While the disclosed documents give some indication that other vehicles were mentioned in Agent Moore's interview of Jenkins, the lack of any other discussion about other cars in either the Jenkins Rough Notes or the Jenkins ROI indicates that other vehicles were not the focus of the interview. This is not a case where Jenkins affirmatively denied seeing a white car, only to testify later that he did. Thus, had the Jenkins Rough Notes and the Jenkins ROI been disclosed prior to trial, and if defense counsel had cross-examined Jenkins on their content, Jenkins could have responded with the explanation that he was not asked about any other cars at the time of the interview and any impeachment value would have been minimal.

Moreover, even without the disclosed documents, defense counsel was still able to offer impeachment of Jenkins' testimony. Defense counsel used the testimony of Michael Keegan ("Keegan"), photographs of Chipman Street, photographs of the view from the gravel lot where Jenkins was parked, and measurements of the distance from the gravel lot to the Chipman Street residence to impeach Jenkins' testimony about the white car [Doc. 162, Tr. Vol. 4, pp. 60-70]. This evidence called into question Jenkins' ability to describe the details of any car, especially the white car's red pinstripe, from the gravel lot [*Id.*]. Keegan's testimony was also used to impeach Jenkins' judgment of the actual distance

16

between the gravel lot to the Chipman Street residence [*Id.*]. Thus, even without these documents, Jenkins' credibility was not unchallengeable.

Boyd also argues that Jenkins' description of the details of the white car—such as its red pinstripe, which Jenkins testified he saw at night, from the gravel lot, 150 yards away—are details that make Jenkins' story difficult to accept [Doc. 185, p. 6]. However, the inconsistencies in the disclosed documents do not impeach Jenkins' ability to observe these details any more then his ability to observe had already been impeached at trial. Defense counsel presented testimony, by way of Keegan, that such details would have been nearly impossible to distinguish at night from 150 yards away. Defense counsel also challenged Jenkins' statement that no one, from 150 years away, at night, could ever be a hundred percent sure about the identification of a specific car. This impeachment tactic, challenging Jenkins' observations and ability to perceive, was fully available and utilized by defense counsel without the disclosed documents.

The impeachment value of the other inconsistences, Jenkins' time of arrival, the level of activity around the residence, and Jenkins' descriptions of the occupants of the 4-Runner, would have been minimal. While the time Jenkins gave for his arrival at work in the Jenkins ROI differed from Jenkins' testimony at trial, his clock-in time on the time sheet, 2:16 A.M., did not change. Most of Jenkins' testimony pertains to shortly before that two o'clock hour and the hours after. The difference between these two times are insignificant given that Jenkins never testified that he was absolutely sure of the time and because evidence independent from Jenkins' testimony (the time sheet) placed him at work around this time.

17

Accordingly, the Court does not find these inconsistencies to be materially impeaching. Also, Jenkins' descriptions of the occupants of the 4-Runner and their actions are, on the whole, largely consistent.

Moreover, while Jenkins was an important witness and provided testimony from which the jury was able to infer that Boyd knew about the underlying offenses, his testimony was just one piece of a substantial amount of other testimony and evidence presented at trial. Mathis testified that she loaned her white car to Boyd on either January 4 or January 5, 2007, and did not get it back until January 8, 2007 [Doc. 159, Tr. Vol. 1, pp. 91]. Lightfoot's testimony established that Boyd helped Davidson on the evening of January 9, 2007 when he appeared with Davidson at her apartment [Doc. 161, Tr. Vol. 3, pp. 49, 51, 53-55, 60-61, 64-65]. Lightfoot also testified that on January 10, 2007 she saw news coverage of Christian's body, along with an image of Davidson relating him to the crime, and that both Boyd and Davidson were in the apartment at the time [*Id.*, pp. 60-63]. Armstrong testified that he saw Boyd with Davidson the night of January 9, 2007 and that Boyd called Armstrong's cell phone for help [*Id.*, pp. 92-99, 100-05]. Cell phone records confirmed these calls. LaKeisha Greer testified that Boyd came to her apartment and requested a ride for Davidson [*Id.*, pp.128-31] and Lessa Greer testified that she heard the conversation between LaKeisha Greer and Boyd [*Id.*, pp. 137-41]. While Jenkins' testimony provided evidence that Boyd may have had knowledge of the underlying crimes earlier than when he hid Davidson in the Reynolds Street house, numerous other witnesses also testified as such. Even if Boyd was not present at the Chipman Street residence on January 7, 2007, there was

18

a substantial amount of other testimony and evidence to show that Boyd had knowledge of the underlying offenses well before the time in which Boyd and Davidson broke into the Reynolds Street house. *See Beuke v. Houk*, 537 F.3d 618, 635-36, (6th Cir. 2008) (stating that "even if we were to assume that this undisclosed evidence would have tarnished [the witness's] credibility beyond repair, it does not negate or even diminish the substantial objective evidence of [the defendant's] guilt").

A defendant proves a *Brady* violation by "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. In *Kyles*, the suppressed evidence indicated that another person, not the defendant, may have planted incriminating evidence or even been the guilty party. *Id.*, at 424-32. The exculpatory and impeachment value of the documents disclosed in this case falls far short of that.[12] For purposes of *Brady*, the impeachment evidence must go towards a witness who supplied the only evidence of essential elements linking the defendant to the crime or evidence regarding a witness whose reliability and credibility would be determinative of guilt or innocence. *Giglio*, 405 U.S. at 153-55. As stated above, Jenkins' testimony was clearly not the only evidence establishing Boyd's aid

---

[12]The disclosed documents in this case are similar in impeachment value to the disclosed evidence in *Johnson v. Bell*, 525 F.3d 466, 475-79 (6th Cir. 2008). In *Johnson*, despite the existence of evidence impeaching several of the government's primary witnesses, the impeachment did not detract from three other witnesses' identification of the defendant. *Id.* In this case, despite any impeachment of Jenkins' testimony and his credibility, the testimony of the government's other witnesses, Lightfoot, Armstrong, LaKeisha Greer, and Kamara Bangura, clearly established essential elements of the charges against Boyd. The existence of the cell phone records, introduced at trial, further strengthened such testimony.

to Davidson and Boyd's knowledge of the underlying crimes. Moreover, for the jury to have found Boyd guilty of the offenses charged, accessory after the fact and misprision of a felony,[13] the testimony of numerous other witnesses supported the government's argument that Boyd helped Davidson and knew of the underlying crimes. *See Coleman*, 273 F. Supp. at 280.

While there is no question that the disclosed documents contained some impeachment material, and no question that the government should have disclosed these documents prior to trial,[14] the final prong of a *Brady* violation, requiring that the suppressed impeachment evidence be "material" under *Gigilio*, has not been met. *See Strickler*, 527 U.S. at 290; *Kyles*, 514 U.S. at 435. The Court finds that the inconsistencies relative to Jenkins' testimony do not rise to the level of "material" evidence under *Brady* and *Giglio* because Jenkins' testimony and his reliability were not determinative of Boyd's guilt or innocence and Jenkins' testimony certainly did not supply the only evidence of essential elements of the crimes for which Boyd was charged. Thus, the disclosure of the Jenkins Rough Notes and the Jenkins ROI does not undermine confidence in the verdict.

---

[13]18 U.S.C. §§ 3, 4.

[14]The government has acknowledged that these documents should have been disclosed to the defense pursuant to *Brady*, but argues that their impeachment value is minimal, if any, and the failure to disclose did not undermine confidence in the verdict and therefore, no new trial should be granted [*See* Doc. 181].

20

### 3. The Bangura ROI and Bangura's Trial Testimony

Bangura, a young girl, testified at trial that she saw Boyd dialing and talking on her mother's cell phone when Boyd came to the apartment Bangura shared with her mother on the morning of January 11, 2007 [Doc. 161, Tr. Vol. 3, pp. 167-172]. At trial, beyond her testimony that she saw Boyd using, dialing, and talking on her mother's cell phone, Bangura could not say whom Boyd telephoned, how many phone calls he made, or what he said [*Id.*]. The government used Bangura's testimony to establish that Boyd helped Davidson after he left Davidson in the vacant home on Reynolds Street and that Boyd used Kamara's cell phone to communicate with Davidson.

In contrast, the Bangura ROI states that Bangura responded to most questions about the morning of January 11, 2007 with the statement that she "did not remember." [Doc. 181-5, "Bangura ROI"]. For instance, the Bangura ROI states that Bangura "did not remember" if Boyd "used the phone" or if Boyd "took a phone with him" [*Id.*]. Consistent with the Bangura ROI, Agent Bobich, the special agent who interviewed Bangura, states in her affidavit that Bangura was essentially unresponsive during the interview and generally shrugged her shoulders in response to questions [Doc. 181-6, "Bobich Affidavit"].

### 4. Analysis of the Bangura ROI and Bangura's Trial Testimony

While the Court notes that the Bangura ROI is inconsistent with Bangura's testimony at trial, the Court does not find such inconsistencies to be material for *Brady* and *Giglio* purposes, or that they undermine confidence in the verdict. Bangura, a juvenile, was reluctant to answer questions, both in her interview with Bobich [Doc. 181-6, "Bobich

Affidavit"], and at trial. It would not be unreasonable for a juvenile to refrain from answering questions in one situation and then, when confronted with the enormity of testifying in a trial setting, under oath, in a large federal courtroom, in the presence of a judge, jury, participants, and spectators, to reveal more information.

Further, the substance of Bangura's testimony is cumulative of her mother, Karmara's testimony, and the cell phone records introduced at trial. Kamara testified that Boyd was at her apartment on the morning of January 11, 2007 [Doc. 161, Tr. Vol. 3, pp. 153-54]. Also, cell phone records indicate that Kamara's cell phone called Boyd's cell phone four times around nine in the morning on January 11, 2007 [*Id.*, pp. 157-58]. Further, Kamara testified at trial that she did not know Boyd's cell phone number and did not know the number the government indicated to her was Boyd's cell number, the number her cell phone called the morning of January 11, 2007 [*Id.*]. Therefore, Kamara's testimony and the cell phone record helped establish the inference that Boyd used Kamara's cell phone, and Bangura's testimony only added that Boyd actually talked on the cell phone while he was "using" it. Such testimony is cumulative.

Finally, as stated above in the Court's analysis of Jenkins' testimony, the government introduced witnesses who testified to Boyd's knowledge of the underlying offenses well before Boyd ever came into contact with Bangura. The testimony of Mathis, Lightfoot, Armstrong, and LaKeisha and Leesa Greer pertained to events that occurred before Bangura's testimony placed Boyd as talking on Kamara's cell phone.

22

In sum, while the Bangura ROI and Bangura's testimony at trial offer some inconsistencies, and the Bangura ROI could have been used by defense counsel to impeach some of Bangura's testimony, the Bangura ROI does not rise to the level of materiality *Brady* and *Giglio* demand for a new trial. *See Beuke*, 537 F.3d at 635-36. Bangura was not a witness who supplied the only evidence linking Boyd to the crime, her credibility was not determinative as to Boyd's guilt or innocence, and she was not a witness who supplied the only evidence of essential elements directly material to Boyd's guilt or innocence. *See Giglio*, 405 U.S. at 154-55. As such, the government's failure to disclose the Bangura ROI is not grounds for a new trial because the Bangura ROI is not impeachment evidence considered "material" for the purposes of *Brady* and *Giglio*.

## B. New Trial Under Rule 33(b)

As previously stated, the standard for granting a new trial under Federal Rule of Criminal Procedure 33(b) is more stringent then the standard for granting a new trial for violations of *Brady*. Thus, because the Court has determined that Boyd has not met the more lenient *Brady* standard and shown that the withheld evidence at issue was "material" for *Brady* and *Giglio* purposes, *Graham*, 484 F.3d at 417, the Court need not reach the issue of whether Boyd would be entitled to a new trial under the Rule 33(b) standard, which requires that the newly discovered evidence "would likely produce an acquittal." *O'Dell*, 805 F.2d at 640.

However, even if the Court were to analyze Boyd's claim under Rule 33(b), Boyd would fail to meet his burden of proving the necessity of a new trial. Boyd has satisfied the

23

first two prongs required under Rule 33(b), (1) that the new evidence was discovered after the trial, and (2) that the evidence could not have been discovered with due diligence. *See O'Dell*, 805 F.2d at 640. However, Boyd has failed to satisfy the remaining two prongs, (3) that the evidence be material and not merely cumulative or impeaching, and (4) that it would likely produce an acquittal. *Id.* The disclosed documents contained impeachment information that was not material and was largely cumulative of the other substantial evidence produced at trial. As such, the disclosed evidence cannot satisfy the Rule 33(b) requirement that it would be "likely to produce an acquittal." Accordingly, Boyd's request for a new trial pursuant to Rule 33(b) will also be denied.

### C. Use of Jenkins' Testimony in Determining the Sentence

Boyd also argues that he was denied due process at his sentencing because the Court relied upon Jenkins' trial testimony to establish that Boyd knew of the underlying crimes on January 7, 2007. As support for this assertion, Boyd states that the Court put a separate section in its Sentencing Memorandum titled "Trial Testimony Establishing Defendant Boyd's Accountability in the Criminal Offense" [Doc. 185], and that the Court began its discussion with Jenkins' testimony. What Boyd neglects to mention is that the same section contains the Court's discussion of the testimonies of Mathis, Lightfoot, Armstrong, and LaKeisha and Leesa Greer. In fact, the Court's discussion of all of this testimony proceeded in chronological order and the order in which the witnesses testified at trial. The Court was not attaching special significance to Jenkins' testimony because of its placement.

24

Moreover, in accordance with *United States v. Booker*, 543 U.S. 220 (2005) and its progeny, the Court engaged in a thorough analysis of Boyd's advisory guideline range and the relevant factors of 18 U.S.C. § 3553(a). The Court then made an individualized assessment based on the facts of this case and Boyd's history and characteristics in the Court's determination of an appropriate sentence to fulfill the purposes of § 3553. When the Court discussed the nature and circumstances of the offenses for which Boyd was convicted, the Court focused on Boyd's actions *after* the time in which Jenkins' testimony placed the white car at the Chipman Street residence [Doc. 174, pp. 39-41]. Specifically, the Court discussed Boyd's assistance in helping Davidson hide at the Reynolds Street house, Boyd's attempts to get others to help Davidson, how Boyd brought food to Davidson and let him use his cell phone, how Boyd initially lied to police officers about Davidson's whereabouts, and finally, how Boyd was the only person identified at trial as "willing to actively help, or continue to help, Davidson avoid apprehension after learning of Davidson's involvement in the underlying crimes." [*Id.*, p. 40]. It is clear that the Court did not rely solely on Jenkins' testimony in determining the sentence but used Jenkins' testimony as part of its focus on the evidence as a whole—of which there was plenty—to impose a sentence that was sufficient, but not greater than necessary, to comply with the purposes of 18 U.S.C. § 3553. Accordingly, Boyd's argument that he was denied a fair sentencing is hereby denied.

### D. Motion to Poll the Jury

Boyd also seeks an order allowing defense counsel to question the jurors to determine what they would have done given the existence of the Jenkins ROI and the Jenkins Rough

25

Notes. Federal Rule of Evidence 606(b) addresses what constitutes permissible inquiry into the decisions of a jury. Fed. R. Evid. 606(b). Rule 606(b) is designed to prohibit the testimony of jurors on matters that take place during deliberations, the effect of anything on the jurors' minds or emotions, and the mental process of any juror. *United States v. Logan*, 250 F.3d 379 (6th Cir. 2001). Specifically, Rule 606(b) provides that

> [A] juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent or to dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear on any juror, or (3) whether there was a mistake in entering the verdict on the verdict form.

Fed. R. Evid. 606(b). Further, "[a] juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying." *Id.*

Allowing defense counsel to poll the jury regarding the impact the Jenkins Rough Notes and the Jenkins ROI would have had on their verdict does not fall under one of the exceptions stated in Rule 606(b). Moreover, Boyd's request falls under the specific prohibition of Rule 606(b) of an inquiry into "the effect of anything upon that or any other juror's mind or emotions as influencing the juror . . . ." Fed. R. Evid. 606(b). As such, Boyd's request to question the jurors regarding the Jenkins Rough Notes and the Jenkins ROI is hereby denied.

## V.    Conclusion

For the foregoing reasons, the Court finds that the disclosed documents, the Jenkins Rough Notes, the Jenkins ROI, and the Bangura ROI, are not material for purposes of *Brady* and *Giglio*. While the documents contain material that is inconsistent with some aspects of Jenkins' and Bangura's testimony at trial, when viewed collectively, the documents do not undermine confidence in the verdict and the government's failure to disclose the documents did not deprive Boyd of a fair trial and due process. *See Stickler*, 527 U.S. 289-90. The Court also finds that the Court's use of Jenkins' testimony at sentencing did not deprive Boyd of a fair sentencing. Finally, under these circumstances, the Court finds that Boyd's request to question the jury is not warranted under Federal Rule of Evidence 606(b) and the Court finds no other overarching reason to support such a request.

Thus, because the Court finds that there was no violation of *Brady* and *Giglio* and no violation of Rule 33(b), Boyd's Motion for a New Trial Based on Newly Discovered Evidence and Motion to Poll the Jury on What Difference the Documents Withheld from the Defense Would Have Had in their Deliberations and Verdict [Doc. 184] is not well-taken, and hereby **DENIED**. Boyd's request to question the jury is also **DENIED**, and Boyd's request for a hearing is also **DENIED**.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE